The **PEOPLE** of the State of Colorado, Plaintiff-Appellee,

v.

**Ramon ROMERO, Defendant-Appellant.**

No. 82SA566.

Supreme Court of Colorado, En Banc.

Jan. 21, 1985.

**1258** 

Duane Woodard, Atty. Gen., Charles B. Howe, Deputy Atty. Gen., Joel W. Cantrick, Sol. Gen., Marie Volk Bahr, Asst. Atty. Gen., Denver, for plaintiff-appellee.

David F. Vela, Colorado State Public Defender, Linda Hotes, Deputy State Public Defender, Denver, for defendant-appellant.

QUINN, Justice.

The defendant, Ramon Romero, appeals his conviction and sentence for second degree burglary of a building.[1] He claims that the district court erred in permitting him to represent himself at trial, in failing to appoint advisory counsel to assist him at trial, in failing to provide him the same opportunities to be heard as would have been provided to an attorney, in permitting him to be tried in jail clothes, in submitting certain instructions to the jury and in failing to submit other instructions on the court's own motion, and in imposing a sentence greater than the presumptive two-to-four year sentence for second degree bur-

---

1. § 18–4–203, 8 C.R.S. (1978 & 1984 Supp.).

glary.[2] We affirm the judgment and sentence.

## I.

A detailed statement of the proceedings leading up to the judgment and sentence is necessary to a complete understanding of the issues before us. A complaint-information was filed in the Denver County Court alleging that "Raymond Romero also known as Daniel Jiminez" did knowingly break into the building of Denver Dry Goods, Inc., located at 1529 California Street, Denver, Colorado, on January 11, 1981, with the intent to commit therein the crime of theft. The public defender's office was appointed to represent the defendant at a preliminary hearing, and upon a finding of probable cause the case was bound over to the district court. The defendant was not able to post bail and remained in the county jail while awaiting trial.

On February 13, 1981, the defendant appeared with a deputy public defender, Maureen Cain, for arraignment in the district court and informed the court that he preferred to hire private counsel. Ms. Cain simultaneously requested and was given permission to withdraw from the case due to an alleged conflict of interest. One week later, on February 20, 1981, the defendant reported to the court that he had not yet been able to retain private counsel. Upon being advised by Cain that the source of the conflict was the defendant's refusal to discuss the case with her and thinking that the defendant might possibly be having problems communicating in English, the court requested Manuel Martinez, a deputy public defender fluent in the Spanish language, to speak to the defendant at the county jail. The court continued the case to February 26, 1981, for arraignment.

On February 26 the defendant appeared in court and stated that Mr. Martinez had not been to see him at the county jail. Deputy Public Defender Cain explained to the court that her superior believed that as long as the public defender's office was to remain on the case she should be the attorney who represented the defendant. The court, indicating that it was considering the appointment of private counsel, continued the case to March 3, 1981, for arraignment. On that occasion the court expressly noted on the record that the public defender's original motion for withdrawal was based solely on the defendant's personal dislike for Ms. Cain. Ruling that this was an insufficient ground for withdrawal, the court ordered the public defender's office to continue its representation of the defendant. The defendant again stated that he wished to hire private counsel, and the court continued the case three more weeks for arraignment.

On March 24, 1981, the defendant reported that he could not retain private counsel, whereupon the court again reaffirmed the appointment of the public defender's office and continued the case to the following day. On March 25 the defendant again appeared in court with Ms. Cain, who advised the court that she had discussed the case with the defendant on three occasions and that the defendant had told her that he did not want the public defender's office to represent him. The court addressed the defendant and informed him that if he desired court-appointed counsel the public defender's office would represent him throughout the trial. The defendant, however, stated to the court that he desired to represent himself and to enter a not guilty plea. At this point the court explained to the defendant that he had a right to represent himself, but that it was in his best interest that a lawyer represent him, especially since he was charged with a class 4 felony carrying a presumptive sentence of two-to-four years and a possible maximum sentence of eight years in the event aggravating circumstances were present. The court also informed the defendant of his right to require the prosecution to prove

---

**2.** Because the defendant challenged the constitutionality of the presumptive sentencing statute, § 18-1-105(6), 8 C.R.S. (1984 Supp.), the case was transferred to this court. §§ 13-4-102(1)(b) and 13-4-110(1)(a), 6 C.R.S. (1973).

his guilt beyond a reasonable doubt at trial and various other procedural rights, such as the right to a trial by jury, the right to cross-examine the prosecution's witnesses, the right to subpoena and to present witnesses in defense of the charge, the right to testify in his own defense, and the right to discover the prosecution's evidence in advance of trial. The court ordered the prosecutor to provide the defendant with a transcript of the preliminary hearing and other appropriate discovery materials. The prosecutor, for the purpose of showing the defendant's familiarity with the criminal justice system, requested that his prior criminal history be made part of the record of the proceedings on that day.[3] The court acquiesced in the prosecutor's request, and the defendant entered a not guilty plea and requested a jury trial. The case was set for trial on May 11, 1981. Finally, the court appointed an investigator to assist the defendant in preparation for trial.

On April 16, 1981, the court held a hearing to determine the progress of the defendant's trial preparation. The investigator appointed by the court had previously filed a written report with the court on March 30 in which he described his visits to the county jail on two occasions and the defendant's refusal to talk to him about the case. The court determined that the defendant did not want the assistance of the investigator in preparation for trial. The deputy district attorney on this occasion furnished the defendant with a copy of all materials in the prosecution's file.

On the scheduled trial date of May 11, 1981, the defendant advised the court that he had not yet received a copy of the preliminary hearing transcript. The court ordered the transcript to be provided the defendant that afternoon and continued the case to the following day for jury selection and trial. Before commencing jury selection on May 12, the court explained to the defendant the procedures involved in questioning prospective jurors, informed him that he could challenge up to eleven members of the jury panel for no reason at all, and also provided him with a written list of the grounds for challenges for cause. The court also explained to the defendant the procedures that would be followed in the trial of the case, namely, opening statements outlining the evidence, the opportunity of each party to present evidence and to cross-examine witnesses called by the opposing party, the preparation of jury instructions at the conclusion of the evidence, and closing arguments.

After the jury was selected and sworn, the prosecutor made an opening statement in which he informed the jury that the People's evidence would show that on January 11, 1981, the defendant broke a window into the Denver Dry Goods downtown store at 1529 California Street in Denver, then made his way to the jewelry department where he was confronted and taken into custody by a security guard, later attempted to escape but was subdued by the security guard, and was ultimately arrested by the Denver police. The defendant in his opening statement stated that he was "pretty well intoxicated" at the time of the offense, that he might have fallen asleep on a pallet near the store, and that when he awoke in city jail he was "pretty well beaten up."

The prosecution's evidence established the following events. At about 1:20 a.m. on January 11, 1981, the alarm system in the Denver Dry Goods downtown store alerted the security guard, Samuel Quintana, to the fact that an intruder was present in the store. Quintana traced the alarm to

---

3. The defendant's criminal record shows a prior conviction and sentence for burglary in 1957, sentences in 1959 and 1960 for either separate burglary convictions or parole revocations stemming from the 1957 burglary conviction and sentence, prior convictions and sentences for possession of narcotic drugs in 1963 and 1969, a conviction and sentence for escape in 1972, and a felony theft conviction and sentence in 1976.

Most of these prior convictions were entered in the name of Daniel Jiminez. It was apparently on the basis of this prior record that the prosecution, in anticipation of using the prior convictions for impeachment purposes in the event the defendant testified at trial, charged him under the name of "Raymond Romero, also known as Daniel Jiminez."

the jewelry department where he saw a man rummaging through the drawers located behind the counter. During the trial Quintana identified the defendant as the intruder and described him for the record as follows: "he is sitting right over there ... wearing a green shirt and a red t-shirt, pair of jeans, and tennis shoes."

When Quintana confronted the defendant inside the store, he pressed his belt buckle into the defendant's back as if he had a pistol and ordered him not to move or he would shoot. He then led the defendant to the guard station where he placed him in a chair and took a night stick from under the counter. Someone from the central alarm system telephoned and told Quintana that the police had been called. A short time later the phone rang again. As Quintana answered, the defendant grabbed the night stick and raised his arm to strike. Quintana subdued the defendant by hitting him in the stomach and, after retrieving the night stick, by striking him about the head and shoulders.

As Quintana was fighting with the defendant, Denver Police Officer James Negri arrived and handcuffed the defendant to a railing in the store. Quintana and Negri made a search of the store and discovered a broken window on the alley side of the building, beneath which a pallet had been propped up, and an empty canvas bag, normally kept in the dock area, in the jewelry department. The drawers in the jewelry department had been opened and the area was in a state of disarray.

The defendant briefly cross-examined the prosecution's witnesses. He elicited testimony that Quintana, the security guard, had found a bottle of white pills in the search of the store, but that he threw them away because he did not know that they belonged to the defendant. The defendant, however, made no attempt to elicit any testimony from the prosecution's witnesses about his alleged state of intoxication at the time of the offense.

At the conclusion of the prosecution's case, the court explained to the defendant that he could testify in his own defense or could elect to remain silent but that if he testified the prosecutor could question him about prior felony convictions for impeachment purposes. The court arranged for the defendant to secure the presence of two police officers to testify in his case and a third witness who was presently confined in the county jail. The court also directed the sheriff, pursuant to the defendant's request, to permit the defendant to bring to court the clothes that he was wearing on the morning of his arrest.

The defendant called three witnesses in his defense. Not having previously availed himself of the court appointed investigator, he called two police officers who had only incidentally participated in the investigation and elicited no significant testimony from them. The third witness called by the defendant was a county jail inmate who had been confined in the city jail on January 11, 1981, the morning of the defendant's arrest. This witness testified that he saw the defendant at the city jail on January 11 sometime between 5:00 a.m. and 7:00 a.m., at which time the defendant was bleeding from a gash on his head and appeared in a confused state. The defendant offered into evidence and showed to the jury the shirt, pants, and shoes that he had been wearing on the morning of his arrest. The court then announced a recess in order to provide the defendant with an opportunity to consider whether he wanted to testify. The defendant decided to forego testifying and so informed the court at the end of the recess.

After both sides rested the defendant unsuccessfully moved for a judgment of acquittal. In meeting with the prosecutor and the defendant to settle instructions, the court advised the defendant that it would abide by his decision on whether the jury should be instructed on his election not to testify. It was the defendant's decision, so far as we can determine from the record, that no such instruction should be given to the jury. The jury, accordingly, was not instructed on the defendant's election not to testify. The defendant made no objection to the jury instructions given by the

court, nor did he tender any instructions for the court's consideration.

The prosecutor delivered a summation to the jury, and the defendant did likewise. The defendant's summation, which was extremely brief, consisted basically of calling the jury's attention to the fact that no fingerprints had been lifted from the scene and then acknowledging that "I ain't saying I didn't do the crime or anything like that, but basically, I passed out ... on drugs."

After the jury returned a guilty verdict, the defendant filed a motion for new trial and also requested the appointment of counsel to assist him in perfecting an appeal. The court appointed the public defender's office to assist the defendant and granted several continuances so that a deputy public defender could review the trial transcript and supplement the grounds listed in the defendant's motion for new trial. On October 28, 1981, the court denied the motion for new trial.

Finding that extraordinary aggravating circumstances were present which justified a sentence beyond the presumptive range of two to four years, the court sentenced the defendant to a term of seven years plus one year of parole, with credit for presentence confinement from the date of the defendant's arrest on January 11, 1981, to October 28, 1981, the date of the sentence. The extraordinary aggravating circumstances, as reflected in the court's written findings, consisted of the defendant's having been on parole when the burglary was committed and the defendant's prior criminal record of at least three felony convictions.[4] This appeal followed.

## II.

We first address the defendant's claims relating to his self-representation. He argues that he is entitled to a new trial for three reasons: (1) the trial court erred in allowing him to proceed pro se because he did not effectively waive his right to counsel; (2) his efforts at self-representation were so inept that the trial court's failure to appoint advisory counsel denied him a fair trial; and (3) the trial court erred in failing to provide him the same opportunities to be heard as would have been accorded an attorney. We are unpersuaded by the defendant's arguments.

## A.

■ A criminally accused enjoys the constitutional right of self-representation. This right has its source both in the historical antecedents to and in the structure of the Sixth Amendment, which provides that "[i]n all criminal prosecutions the accused shall ... have the assistance of counsel for his defense." U.S. Const. amend. VI. Historically, as the Supreme Court noted in *Faretta v. California*, 422 U.S. 806, 821, 95 S.Ct. 2525, 2534, 45 L.Ed.2d 562 (1975), only one tribunal in the long history of English jurisprudence ever adopted a practice of forcing counsel upon an unwilling defendant in a criminal proceeding—the infamous Star Chamber. The American colonies were even more fervent in maintaining the right of self-representation. Although colonial courts permitted an accused to be represented by counsel, the general practice still continued to be that of self-representation. *Faretta*, 422 U.S. at 828, 95 S.Ct. at 2537. Article II, section 16 of the Colorado Constitution leaves no doubt on the matter of an accused's right of self-representation. It expressly provides that "[i]n criminal prosecutions the accused shall have *the right to appear and defend in person* and by counsel." (Emphasis added).

As the Supreme Court also noted in *Faretta*, the structure of the Sixth Amendment is such that the express guarantee of the right to counsel implicitly embodies a cor-

---

**4.** In imposing sentence the court orally referred to the defendant's seven prior felony convictions as the basis for the enhanced seven year sentence. Later, pursuant to a remand from the court of appeals, the court entered written findings as to extraordinary aggravating circumstances and specifically found that the defendant was on parole for a prior felony conviction at the time of the burglary and that he had sustained at least three prior felony convictions.

relative right to dispense with a lawyer's help:

> The Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense. It is the accused, not counsel, who must be "informed of the nature and cause of the accusation," who must be "confronted with the witnesses against him," and who must be accorded "compulsory process for obtaining witnesses in his favor." Although not stated in the Amendment in so many words, the right to self-representation—to make one's own defense personally—is thus necessarily implied by the structure of the Amendment. The right to defend is given directly to the accused; for it is he who suffers the consequences if the defense fails.

*Faretta,* 422 U.S. at 819–20, 95 S.Ct. at 2533 (footnote omitted).

▮ The right of self-representation, therefore, is personal to the defendant and may not be abridged by compelling a defendant to accept a lawyer when he desires to represent himself. To force a lawyer on a defendant under these circumstances "can only lead him to believe that the law contrives against him." *Faretta,* 422 U.S. at 834, 95 S.Ct. at 2540. Because the right of self-representation furthers the basic value of personal autonomy, it is the defendant who must decide whether it is to his advantage to have counsel in his particular case. Although a pro se defendant "may conduct his own defense ultimately to his own detriment, his choice must be honored out of 'that respect for the individual which is the lifeblood of the law.'" *Faretta v. California,* 422 U.S. at 834, 95 S.Ct. at 2541, quoting *Illinois v. Allen,* 397 U.S. 337, 350–51, 90 S.Ct. 1057, 1064, 25 L.Ed.2d 353 (1970) (Brennan, J., concurring).

▮ Since the exercise of the right of self-representation results in a relinquishment of the right to counsel, it is the responsibility of the trial court to ascertain whether the accused has been made aware of the dangers and disadvantages of self-representation, at least to the point where the record shows that " 'he knows what he is doing and his choice is made with eyes open.'" *Faretta,* 422 U.S. at 835, 95 S.Ct. at 2541, quoting *Adams v. United States ex rel. McCann,* 317 U.S. 269, 279, 63 S.Ct. 236, 242, 87 L.Ed. 268 (1942). Only in this way can the trial court be satisfied that the accused has knowingly and intelligently decided to forego the traditional benefits associated with the right to counsel. *See Faretta,* 422 U.S. at 835–36, 95 S.Ct. at 2541; *People v. Lucero,* 200 Colo. 335, 340, 615 P.2d 660, 663 (1980); *Reliford v. People,* 195 Colo. 549, 552–53, 579 P.2d 1145, 1147 (1978), *cert. denied* 439 U.S. 1076, 99 S.Ct. 851, 59 L.Ed.2d 43 (1979). Although an accused's legal knowledge is not relevant to an assessment of whether his exercise of the right to defend himself is knowingly made, *Faretta,* 422 U.S. at 836, 95 S.Ct. at 2541, there must nevertheless be an affirmative showing of record that the accused understands the charge he is facing and the range of possible penalties, that he knows of his right to the assistance of counsel and is aware of the hazards in proceeding pro se, and that his decision to represent himself is the product of his informed free will.

▮ The record in this case affirmatively shows that the defendant's decision to represent himself was knowingly and intelligently made and was the product of his voluntary choice. The defendant had been through a preliminary hearing with a deputy public defender and was fully aware of the charge facing him. At the hearing on March 25, 1981, the trial court explained the possible penalties applicable to the charge and the basic procedural rights of an accused at a criminal trial. The court also informed him that, although he had the constitutional right to represent himself, it was clearly in his own best interest to avail himself of the services of his court-appointed attorney in defending against such a serious charge. The defendant nonetheless persisted in rejecting the ser-

vices of a court-appointed lawyer and voiced his decision to represent himself. We cannot say under these circumstances that the court erred in permitting the defendant to proceed pro se.

### B.

██ We also reject the defendant's claim that the quality of his self-representation was so inept as to require the trial court to appoint advisory counsel to assist him during the trial. While a defendant has the constitutional right to represent himself, he has no right to the appointment of advisory counsel in connection with the exercise of his right of self-representation. *Locks v. Sumner*, 703 F.2d 403 (9th Cir. 1983), *cert. denied*, — U.S. —, 104 S.Ct. 338, 78 L.Ed.2d 307 (1983); *United States v. Gigax*, 605 F.2d 507 (10th Cir.1979); *Reliford*, 195 Colo. 549, 579 P.2d 1145; *see also McKaskle v. Wiggins*, — U.S. —, 104 S.Ct. 944, 953–54, 79 L.Ed.2d 122 (1984) (court notes in dictum that a pro se defendant has no constitutional right to "hybrid" representation). Nor may a pro se defendant complain that "the quality of his own defense amounted to a denial of 'effective assistance of counsel'." *Faretta*, 422 U.S. at 835 n. 46, 95 S.Ct. at 2541 n. 46. We do acknowledge, however, that there may be circumstances where a pro se defendant's performance reaches such a level of ineptitude as to demonstrate a fundamental inability to provide any meaningful representation in his defense. For this reason a trial court should closely monitor the proceedings in order to ensure that they do not

become so fundamentally unfair as to result in a denial of due process of law.[5]

██ The appointment of advisory counsel is one method of ensuring that the defendant has available a resource person from whom he can seek direction on matters pertinent to his defense and, if necessary, who can take over the case in the event the defendant is unable to continue. Although a salutary practice to be strongly encouraged even over the objection of an accused, the appointment of advisory counsel remains essentially a matter of trial court discretion. *E.g.*, *Faretta*, 422 U.S. at 835 n. 46, 95 S.Ct. at 2541 n. 46; *Reliford*, 195 Colo. at 554, 579 P.2d at 1148–49. Factors which should inform the exercise of discretion include the factual and legal complexity of the issues, the defendant's familiarity with the criminal trial process, and his formal education and ability to effectively communicate with the court and jury.[6] *See Reliford*, 195 Colo. at 554, 579 P.2d at 1148–49.

██ Although it would have been preferable for the trial court to have appointed advisory counsel for the defendant, we cannot say that the failure to do so constituted reversible error. The factual and legal issues in the case were simple and clear-cut. After the defendant elected to proceed pro se, the trial judge at various stages of the case explained to him pertinent legal procedures. The defendant did not hesitate to ask questions of the court at various times and, so far as the record shows, understood and was satisfied with the court's responses. The record further shows that the defendant, notwithstanding a minimal edu-

---

5. The mere fact that an accused validly waives counsel and elects to proceed pro se does not prohibit the court from reminding the accused at appropriate stages of the proceedings of his continuing right to reclaim the assistance of counsel. *See People v. Wilks*, 21 Cal.3d 460, 469 n. 5, 578 P.2d 1369, 1374 n. 5, 146 Cal.Rptr. 364, 369 n. 5 (1978) (reinquiry into the decision to proceed pro se necessary in certain cases); *Reliford v. People*, 195 Colo. 549, 553–54, 579 P.2d 1145, 1148 (1978) (validity of waiver bolstered by repeated inquiry into decision to proceed pro se). *But see State v. Carpenter*, 390 So.2d 1296, 1299 (La.1980) (reinquiry not necessary because

waiver carries forward through all stages of proceedings).

6. Although the defendant's level of literacy and education, as well as his technical legal knowledge, are not relevant considerations in determining whether the exercise of his right to defend himself is knowingly made, *Faretta v. California*, 422 U.S. 806, 835–36, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562 (1975), these factors may appropriately be considered by the court in deciding whether to appoint advisory counsel for the defendant.

cation[7] and some difficulty in expressing himself, participated in all phases of the trial. He made an opening statement, briefly cross-examined the prosecution witnesses, called defense witnesses, and argued the case to the jury in summation. While it is true that the defendant did not present any evidence to support his claim of voluntary intoxication, there is nothing of record suggesting that any of the trial witnesses could have offered such evidence even if specifically questioned about the matter. The defendant might have provided such evidence through his own testimony, but undoubtedly made the tactical decision not to testify in order to avoid exposing his prior felony record to the jury. In short, although the defendant might well have fared better if he had the benefit of advisory counsel and actually availed himself of counsel's advice, we are unable to conclude that the defendant's performance was so inept as to render the court's failure to appoint advisory counsel a violation of the defendant's due process right to a fair trial.

## C.

▇ The defendant also asserts that the trial court's failure to accord him the same opportunities to be heard as would have been given to an attorney deprived him of a fair trial. The record, however, belies his contention. The trial judge explained pertinent procedures to the defendant at various stages of the trial, assisted him in securing the presence of his witnesses and arranged for the sheriff to make available to him the clothing that he was wearing at the time of his arrest, and afforded the defendant full opportunity to be heard on any matter that he desired to raise.

▇ To the extent that the defendant's argument implies that a pro se defendant is entitled to opportunities over and above those normally accorded an attorney, we reject such implication as unfounded in law. By electing to represent himself the defendant subjected himself to the same rules, procedures, and substantive law applicable to a licensed attorney. A pro se defendant cannot legitimately expect the court to deviate from its role of impartial arbiter and accord preferential treatment to a litigant simply because of the exercise of the constitutional right of self-representation.

## III.

The defendant next asserts that the court erred in permitting him to stand trial in prison clothes without informing him of his right to wear civilian clothes. We find no merit in this claim.

▇ In *Estelle v. Williams*, 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976), *reh'g denied* 426 U.S. 954, 96 S.Ct. 3182, 49 L.Ed.2d 1194 (1976), the United States Supreme Court considered whether an accused who is tried by a jury in identifiable prison clothing is denied due process or equal protection of the laws. Although recognizing that an accused's prison clothing is likely to have a continuing influence on the jury and that persons who secure their release on bail are not subjected to such a condition, the Court nonetheless held that the critical factor was the governmental compulsion to stand trial in prison clothing after the accused or his counsel has first objected to such procedure.[8]

---

**7.** Although the record shows very little concerning the defendant's educational background, a statement made by the defendant at the sentencing hearing indicates that his formal education was indeed minimal. The reason for the sparsity of information on the defendant's background is due primarily to his refusal to provide such information to the court. Prior to the sentencing hearing a probation officer had met with the defendant on three separate occasions in an effort to prepare a presentence report for the court, but the defendant refused to discuss any aspect of his background with the officer and later told the court that he did not desire a presentence report. The court, with the concurrence of the defendant and the prosecuting attorney, finally dispensed with a presentence report pursuant to section 16–11–102(4), 8 C.R.S. (1984 Supp.).

**8.** The court in *Williams*, 425 U.S. at 508–09, 96 S.Ct. at 1695, elaborated on the compulsion requirement as follows:

The reason for this judicial focus upon compulsion is simple; instances frequently arise

Thus, although a state cannot compel an accused to stand trial while dressed in identifiable prison clothes, "the failure to make an objection to the court as to being tried in such clothes, for whatever reason, is sufficient to negate the presence of compulsion necessary to establish a constitutional violation." *Williams*, 425 U.S. at 512–13, 96 S.Ct. at 1697.

■ In this case the defendant was not tried in identifiable prison clothing. The only reference in the record to the clothes worn by the defendant during the trial is the testimony of Samuel Quintana, the security guard. Quintana identified the defendant as the person who had entered the Denver Dry Goods store in the early morning hours on January 11, 1981, and who was sitting in the courtroom dressed in "a green shirt and a red t-shirt, a pair of jeans, and tennis shoes." Nothing in the record indicates that the clothing worn by the defendant had identifiable letters, stripes, or marks that are normally associated with prison garb. Moreover, the defendant failed to make an objection to being tried in the clothes he was wearing at the trial, and in the absence of such an objection we will not presume that he was somehow compelled to wear this clothing against his will.

### IV.

The defendant raises four arguments relating to jury instructions given by the court and those not given by the court. He argues that the court erred in referring to him in the jury instructions as "Raymond Romero also known as Daniel Jiminez" and in advising the jury of the circumstances under which a private person may use physical force against another to effect an arrest. He also contends that the court erred in failing to instruct the jury on the affirmative defense of intoxication and in failing to submit for the jury's considera-

where a defendant prefers to stand trial before his peers in prison garments. The cases show, for example, that it is not an uncommon defense tactic to produce the defendant in jail clothes in the hope of eliciting sympa-

tion the lesser offenses of second and third degree criminal trespass. We find no reversible error occurred in this case.

### A.

We first address the defendant's challenge to the alias in the jury instructions. An examination of the record discloses that the caption of the instructions and Instruction No. 2, which summarized the charge, referred to the defendant as "Raymond Romero also known as Daniel Jiminez," as did the verdict forms submitted to the jury. In *People v. DeHerrera*, 680 P.2d 848 (Colo.1984), we recently reversed a conviction for aggravated robbery under circumstances where the trial court first denied the defendant's motion to strike an alias from the information, then admitted into evidence over the defendant's objection two driver's licenses in different names seized from the defendant after his arrest, and finally instructed the jury, again over the defendant's objection, that the use of an alias after a crime has been committed is a circumstance which the jury may consider in determining guilt. Although noting that evidence of an alias may be relevant when a defendant uses the alias to avoid detection or when an issue of identification is raised, we emphasized there was no connection between DeHerrera's aliases and any material issue concerning the avoidance of detection or identification. When the improper admission of alias evidence was considered in light of the jury instruction on the circumstantial value of such evidence, we concluded that the evidentiary error could not be considered harmless:

The instruction directing the jury to consider the use of aliases as a circumstance establishing guilt made the prejudice resulting from the admission of the aliases substantial. The admission of irrelevant and prejudicial evidence is not harmless when it is coupled with an instruction to

thy from the jury. *Anderson v. Watt*, 475 F.2d 881, 882 (CA10 1973); *Watt v. Page* [452 F.2d 1174, at 1176 (CA10 1972)]. *Cf. Garcia v. Beto*, 452 F.2d 655, 656 (CA5 1971).

the jury to consider that evidence as a circumstance establishing guilt. 680 P.2d at 850.

In the instant case, the defendant made no objection to the instructions and verdict forms, and his claim therefore must be evaluated under the plain error standard of review. Crim.P. 52. The proper inquiry in determining whether a claimed error amounts to "plain error" or instead may be considered harmless is whether the error substantially influenced the verdict or affected the fairness of the trial proceedings. *Callis v. People*, 692 P.2d 1045, 1053 (Colo.1984); *People v. Quintana*, 665 P.2d 605 (Colo.1983); *see also Ramirez v. People*, 682 P.2d 1181 (Colo.1984); *People v. Taylor*, 197 Colo. 161, 591 P.2d 1017 (1979); *People v. Barker*, 180 Colo. 28, 501 P.2d 1041 (1972). We are satisfied in this case that, although the trial court should have deleted any reference to the defendant's alias from the jury instructions and verdict forms, the failure to do so was harmless error. This case was tried prior to our decision in *DeHerrera*, and, in contrast to that case, involved neither the admission of evidence showing the defendant's use of an alias nor any instruction permitting the jury to consider the alias as circumstantial proof of guilt. The prosecution did not comment on the alias at any time during the trial, and the jury's attention was not specially directed to the alias in any of the instructions given by the court. Furthermore, in light of the defendant's arrest inside the store while searching through the drawers of the jewelry department, the evidence of guilt can be aptly characterized as overwhelming.

### B.

We turn to the defendant's challenge to Instruction No. 14, which stated in pertinent part that a private citizen "is justified in using reasonable and appropriate physical force upon another person when and to the extent that he reasonably believes it necessary to effect an arrest [or] to prevent the escape from custody of an arrest-ed person who has committed an offense in his presence." The defendant basically contends that the instruction was irrelevant to any issue in the case and therefore was likely to confuse the jury in its resolution of the issues. Again, because the defendant made no objection to Instruction No. 14, the trial court's action must be upheld in the absence of plain error. Crim.P. 52.

We find that the challenged instruction, far from amounting to plain error, was explanatory of a legal issue raised by the defendant during the trial—namely, the validity of the security guard's action in subduing him in the store. The defendant contended in his opening statement that he had been beaten up allegedly without reason, and presented evidence showing that he sustained injuries in the course of his encounter with the security guard inside the store. Instruction No. 14, when considered in this light, was nothing more than a statement of the legal standard applicable to this issue and was properly given to avoid confusion and uncertainty on the part of the jury with respect to this aspect of the case. *See, e.g., People v. Roark*, 643 P.2d 756 (Colo.1982); *People v. Thomson*, 197 Colo. 232, 591 P.2d 1031 (1979).

### C.

We next consider the defendant's claim regarding the trial court's failure to submit on its own motion an instruction on the affirmative defense of intoxication. We acknowledge that section 18–1–804(1), 8 C.R.S. (1978), authorizes the admissibility of evidence of self-induced intoxication to negate the existence of a specific intent crime, such as second degree burglary. *See, e.g., McPhee v. People*, 105 Colo. 539, 100 P.2d 148 (1940). In contrast to the case of *Martinez v. People*, 172 Colo. 82, 470 P.2d 26 (1970), however, where this court reversed a pro se defendant's conviction for assault with intent to commit robbery due to the trial court's failure *sua sponte* to instruct on voluntary intoxication, the defendant in the instant case, although referring to his alleged intoxication

in his opening statement and summation, presented no evidence during the trial that he was indeed intoxicated when he entered the Denver Dry Goods downtown store in the early morning hours of January 11, 1981.

■ The only evidence presented by the defendant regarding his mental condition was testimony from a witness who was confined in the Denver city jail several hours after the defendant's arrest and who testified that the defendant appeared to be in a generally confused state at that time and was bleeding from a gash on his head. This witness' testimony, however, falls far short of evidence of the defendant's intoxication when the crime was committed. Where, as here, the defendant does not present any evidence raising self-induced intoxication as an affirmative defense to the crime charged, the failure of the court to submit on its own motion a jury instruction on this defense cannot be considered reversible error. *See, e.g., People v. Dillon,* 655 P.2d 841 (Colo.1983); *Kurtz v. People,* 177 Colo. 306, 494 P.2d 97 (1972).

### D.

■ The defendant's last contention concerning jury instructions is that the trial court erred in failing to instruct the jury on second and third degree criminal trespass as lesser offenses of second degree burglary of a building. An offense is lesser included when: it is established "by proof of the same or less than all the facts required to establish the commission of the offense charged;" it "consists of an attempt or solicitation to commit the offense charged or a lesser included offense;" or it "differs from the offense charged only in respect that a less serious injury or risk of injury to the same person, property, or public interest or a lesser kind of culpability suffices to establish its commission." § 18–1–408(5), 8 C.R.S. (1978). The crime of second degree burglary consists of knowingly breaking into or entering or remaining unlawfully in a building with the intent to commit therein a crime against a person or property. § 18–4–203(1), 8 C.R.S. (1978). Although second and third degree criminal trespass, both of which involve the unlawful entry or remaining in or upon the premises of another, §§ 18–4–503 and –504, 8 C.R.S. (1984 Supp.), can be considered lesser included offenses of second degree burglary of a building because "premises" includes buildings, § 18–4–504.-5, 8 C.R.S. (1978), a court is not obligated to instruct on a lesser offense unless either the prosecution or the defense requests such instruction. Crim.P. 30; *see People v. Paris,* 182 Colo. 148, 511 P.2d 893 (1973). In this case the defendant made no request for an instruction on any lesser included offense. In the absence of a request by the defendant, it may reasonably be assumed that he elected to take his chance on an outright acquittal or conviction of the principal charge rather than to provide the jury with an opportunity to convict on a lesser offense.

■ Moreover, section 18–1–408(6), 8 C.R.S. (1978), makes clear that a trial court is not obliged to instruct a jury on an included offense unless there is a rational basis for a verdict acquitting the defendant of the offense charged and convicting him of the included offense. The evidence quite clearly showed that the defendant gained entry into the Denver Dry Goods store by breaking a window shortly after 1:00 a.m., made his way to the jewelry department, and was caught in the act of rummaging through drawers in the jewelry department. There was no evidence in the record showing that the defendant merely trespassed onto the property for some purpose other than theft. Under these circumstances, there is no rational basis on which a jury could have acquitted the defendant of the greater offense of second degree burglary of a building while finding him guilty of the lesser offense of trespass. The trial court did not err, therefore, in declining to instruct the jury on the lesser offenses of second and third degree criminal trespass. *See, e.g., People v. Aragon,* 653 P.2d 715 (Colo.1982); *Bowers v. People,* 617 P.2d 560 (Colo.1980); *People v. Saars,* 196 Colo. 294, 584 P.2d 622 (1978).

**1270**

V.

The defendant's final contention relates to the sentence of seven years imposed by the trial court. He argues, first, that section 18–1–105(6), 8 C.R.S. (1984 Supp.), which permits the court to impose a sentence beyond the presumptive range when extraordinary aggravating circumstances are present, violates due process of law because the statute fails to define extraordinary aggravating circumstances. The second prong of his argument is that, even if section 18–1–105(6) passes constitutional muster, the record in this case does not support the seven year sentence imposed by the court. We reject the defendant's claim.

In *People v. Phillips,* 652 P.2d 575 (Colo. 1982), this court rejected a vagueness challenge identical to that raised here. We noted in *Phillips* that sentencing is a discretionary decision requiring the weighing of several factors and that the mere inability to objectively quantify the difference between the statutory terms "aggravating or mitigating circumstances" and "extraordinary mitigating or aggravating circumstances" does not render the presumptive sentencing scheme impermissibly vague. On the contrary, the presumptive sentencing scheme applicable to this case served to guide the exercise of sentencing discretion by requiring the court to make specific findings on the record "detailing the specific extraordinary circumstances which constitute the reasons for varying from the presumptive sentence." § 18–1–105(7), 8 C.R.S. (1984 Supp.).

▇▇▇ In this case the sentencing court specifically found, as extraordinary aggravating circumstances, that the defendant was on parole when he committed the burglary in question and that he had

sustained at least three prior felony convictions. A person's past criminal record and his present parole status are certainly circumstances appropriate for a court to consider in fashioning an appropriate sentence. We cannot say that the trial court erred in finding that the number of the defendant's prior felony convictions and his having been on parole at the time of the burglary constituted extraordinary aggravating circumstances within the intendment of section 18–1–105(6).[9] *See People v. Cantwell,* 636 P.2d 1313 (Colo.App.1981).

The judgment and sentence are accordingly affirmed.

DUBOFSKY, J., concurs in part and dissents in part, and LOHR and NEIGHBORS, JJ., join in the concurrence and the dissent.

DUBOFSKY, Justice, concurring in part and dissenting in part:

I agree with the majority that the totality of circumstances in this case demonstrates that the defendant's waiver of the right to counsel was constitutionally valid; however, I write separately on this issue to express my belief that the district court's waiver procedure was deficient in many respects. I dissent from the majority opinion because, in my view, the failure to appoint advisory counsel under the circumstances of this case was an abuse of discretion, deprived the defendant of a fair trial, and requires reversal of the judgment below.

I.

The majority's finding of a valid waiver of counsel rests upon two grounds: the district court's explanation of procedural rights and possible penalties, and the de-

---

**9.** Subsequent to January 11, 1981, the date of the offense in this case, the legislature amended section 18–1–105 by adding a new subsection which provides that the presence of one or more of five listed factors will constitute extraordinary aggravating circumstances, thereby requiring the court to sentence the defendant to a term greater than the maximum in the presumptive range. Ch. 211, sec. 1, § 18–1–105(9)(a), 1981 Colo.Sess.Laws 970–71. Included in the list of extraordinary aggravating circumstances is the fact that the defendant was on parole or probation for a felony at the time of the commission of the felony in question. § 18–1–105(9)(a)(II) & (III), 8 C.R.S. (1984 Supp.). The amendment also provides that the existence of one or more of the statutory extraordinary aggravating circumstances dispenses with the need for the sentencing court to make specific findings detailing the specific extraordinary circumstances that justify the enhanced sentence. § 18–1–105(9)(b), 8 C.R.S. (1984 Supp.).

fendant's presence at preliminary hearing. Maj. op. at 1264. I agree that these factors, together with the defendant's criminal history and his conduct prior to and at trial, compel the conclusion that his waiver of counsel was voluntary, knowing and intelligent. However, I write separately on this issue primarily to emphasize my view that the district court's colloquy with the defendant concerning waiver of counsel was deficient in many respects, and that our holding on this issue should not be taken as an endorsement of the waiver procedures followed by the district court.

Waiver of a defendant's right to counsel may not be accepted unless the waiver is determined to be both voluntary and intelligent. *Johnson v. Zerbst,* 304 U.S. 458, 465, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938); *People v. Moody,* 630 P.2d 74, 77 (Colo. 1981). In making this determination, the trial court must consider "the background, experience, and conduct of the accused." *Johnson,* 304 U.S. at 464, 58 S.Ct. at 1023. An intelligent waiver of the right to counsel is also dependent upon the defendant's "apprehension of the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter." *Von Moltke v. Gillies,* 332 U.S. 708, 724, 68 S.Ct. 316, 323, 92 L.Ed. 309 (1948). In the context of self-representation, the defendant must in addition "be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.' [Citation omitted.]" *Faretta v. California,* 422 U.S. 806, 835, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562 (1975).

Because of the strong presumption against waiver of the right to counsel, *Von Moltke,* 332 U.S. at 723, 68 S.Ct. at 323, the most appropriate method for establishing the constitutional validity of a defendant's waiver is an on-the-record inquiry by the court into the defendant's awareness of the "dangers and disadvantages" of proceed-

ing *pro se,* as well as an explanation of the elements set forth in *Von Moltke. United States v. Harris,* 683 F.2d 322, 324 (9th Cir.1982); *United States v. Bailey,* 675 F.2d 1292, 1300 (D.C.Cir.), *cert. denied,* 459 U.S. 853, 103 S.Ct. 119, 74 L.Ed.2d 104 (1982); *People v. Lopez,* 71 Cal.App.3d 568, 571–72, 138 Cal.Rptr. 36, 38 (1977); *People v. Lucero,* 200 Colo. 335, 340 n. 3, 615 P.2d 660, 663 n. 3 (1980); *Cohen v. State,* 97 Nev. 166, 625 P.2d 1170, 1171 (1981); *Geeslin v. State,* 600 S.W.2d 309, 313 (Tex.Crim. App.1980). We have held that the waiver of constitutional rights inherent in a guilty plea cannot be considered understanding unless the court has explained to the defendant the critical elements of the crime charged. *Watkins v. People,* 655 P.2d 834, 837 (Colo.1982). The court owes no less to a defendant waiving his right to counsel.

In addition, it is preferable that the court inquire on the record into other factors affecting the defendant's understanding of his situation, such as the defendant's educational background, prior criminal history and other experience. *Lopez,* 71 Cal. App.3d at 573, 138 Cal.Rptr. at 39; *Hsu v. United States,* 392 A.2d 972, 984 (D.C.App. 1978); *Geeslin,* 600 S.W.2d at 313. An on-the-record colloquy not only ensures the validity of the defendant's waiver, but also provides a complete record on appeal that will forestall frivolous claims of denial of the right to counsel and prevent reversals of otherwise valid convictions. *Bailey,* 675 F.2d at 1300; *Lopez,* 71 Cal.App.3d at 571–72, 138 Cal.Rptr. at 38; *Hsu,* 392 A.2d at 983; *cf. Boykin v. Alabama,* 395 U.S. 238, 244, 89 S.Ct. 1709, 1712, 23 L.Ed.2d 274 (1969) (on-the-record inquiry before accepting guilty plea ensures adequate record for review).

Measured against these standards, the district court's inquiry into the defendant's waiver here was deficient in many respects. The court did not explain the elements of and defenses to the charge, nor did it make the defendant "aware of the dangers and disadvantages of self-representation" by impressing upon him the difficulties he might encounter in adhering to the applica-

ble rules of evidence and other technical rules of procedure. *See Maynard v. Meachum,* 545 F.2d 273, 279 (1st Cir.1976) (court must ascertain that defendant is aware of duty to adhere to "technical rules governing the conduct of a trial"); *Lopez,* 71 Cal.App.3d at 572, 138 Cal.Rptr. at 39. In addition, the court failed to ascertain the defendant's educational background[1] and did not inquire into the defendant's criminal history beyond admitting the defendant's criminal record into evidence.[2]

Moreover, I believe that under the circumstances of this case the district court should have re-inquired into the defendant's decision to proceed *pro se* during the weeks that followed the defendant's initial waiver. *See People v. Wilks,* 21 Cal.3d 460, 578 P.2d 1369, 1374 n. 5, 146 Cal.Rptr. 364, 369 n. 5 (1979) (such re-inquiry necessary in certain cases); *Reliford v. People,* 195 Colo. 549, 523–24, 579 P.2d 1145, 1148 (1978), *cert. denied* 439 U.S. 1079, 99 S.Ct. 851, 59 L.Ed.2d 43 (1979) (validity of waiver bolstered by re-inquiry). The defendant's initial waiver was equivocal. He stated that he wanted to represent himself "because I'm under a lot of pressure right now.... I mean, there's a lot of conflict going on right now. And, you know, I ain't going to be pushed into something I don't want to." He also told the court that he wanted to "enter my plea and get these procedures going ... you know, have a speedy trial right away." Because of the strong presumption against a waiver of counsel, the defendant's expression of waiver must be clear and unequivocal. *Brown v. Wainwright,* 665 F.2d 607, 610 (5th Cir.1982). Given the equivocality of the waiver here, and the fact that six

weeks passed between waiver and trial, the district court was remiss in failing to ascertain that the defendant's desire to waive counsel was unabated on the eve of trial. This failure became particularly acute as the trial progressed and the defendant's inability to articulate his thoughts became manifest. (*See* discussion in Part II, *infra.*)

The defective waiver procedure followed here makes the validity of the defendant's waiver of counsel a much closer question than the majority intimates. Nonetheless, I agree with the majority that the defendant's waiver was valid. While an on-the-record colloquy and re-inquiry into waiver was strongly advisable here, other circumstances attending the case—such as the defendant's previous courtroom experience, his conduct before the court, and his prior opportunity to consult with an attorney about his case—may demonstrate that the defendant voluntarily relinquished his right to counsel with an understanding of the consequences. *Harris,* 683 F.2d at 324; *Maynard,* 545 F.2d at 277–78; *United States v. Rosenthal,* 470 F.2d 837, 844–45 (2nd Cir.1972); *Lucero,* 200 Colo. at 340 n. 3, 615 P.2d at 663 n. 3; *Hsu,* 392 A.2d at 983; *Commonwealth v. Hawkins,* 17 Mass. App. 1041, 461 N.E.2d 1242, 1243 (1984); *but see, Bailey,* 675 F.2d at 1300 (on-the-record colloquy mandatory); *Cohen,* 625 P.2d at 1171 (same); *Geeslin,* 600 S.W.2d at 313 (same). Here, the circumstances demonstrate that, despite the defendant's equivocal initial waiver, he voluntarily surrendered his right to counsel. The defendant refused without good cause to accept the services of the attorney assigned to his

---

**1.** The majority blames the lack of record information concerning defendant's educational background on the defendant's refusal to provide such information for a presentence report. Maj. op. at 1266 n. 7. The defendant's failure to cooperate at that late stage of the proceedings bears no relation to the trial court's duty to inquire into the defendant's background prior to accepting a waiver of counsel.

**2.** The obscurity of the information provided by the written criminal record made further in-

quiry into the defendant's criminal history desirable. As the majority notes, it is difficult to tell from the record whether certain of the defendant's previous sentences resulted from conviction or from parole revocation. Maj. op. at 1263 n. 4. In addition, the record does not show whether such convictions were the result of trials or guilty pleas; this distinction is important because previous trial experience indicates the defendant's acquaintance with rules of procedure while previous guilty pleas do not.

case,[3] while failing to procure substitute counsel within the ample time he was given to do so. The refusal to accept the services of counsel here amounted to an implied voluntary waiver of counsel. *People v. Litsey*, 192 Colo. 19, 23, 555 P.2d 974, 977 (1976).

The circumstances also demonstrate that the defendant's desire to waive counsel was predicated on an understanding of the consequences. The defendant had an opportunity to discuss his case with two public defenders over a period of six weeks prior to his waiver. In addition, his extensive prior record, although unclear as to whether his previous convictions arose from trials or guilty pleas, makes it likely that the defendant at some point underwent trial and possessed some awareness of trial procedure. Moreover, as the majority notes, the defendant's presence at his preliminary hearing indicates probable awareness of the nature of the charges against him. Finally, although the court did not inquire into the defendant's educational background, the defendant showed no difficulty in understanding and complying with the court's advice and explanations throughout trial, and thus apparently possessed the capacity to apprehend the import of his previous experience. Under the totality of these circumstances, I would hold the defendant's waiver valid. I repeat, however, that a thorough colloquy on the record in this case would have relieved this court of the speculative task of assessing the meaning of these circumstances.

Therefore, I join the majority in holding the defendant's waiver valid with the understanding that such holding does not approve the waiver procedure followed in this case nor recommend such a deficient inquiry for use in the future.

## II.

Although the district court properly determined that the defendant's waiver of the right to counsel was valid, its duty did not end with this determination. The court before which a defendant appears without counsel has a duty "to take all steps necessary to insure the fullest protection" of the constitutional right to a fair trial "at every stage of the proceedings." *See Von Moltke*, 332 U.S. at 722, 68 S.Ct. at 322. This protective duty extends both to the right to counsel and to all "essential rights of the accused." *Glasser v. United States*, 315 U.S. 60, 71, 62 S.Ct. 457, 465, 86 L.Ed. 680 (1942). Moreover, the state as well as the accused has an interest in the integrity and fairness of the trial process. *Mayberry v. Pennsylvania*, 400 U.S. 455, 468, 91 S.Ct. 499, 506, 27 L.Ed.2d 532 (1971) (Burger, C.J., concurring); *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963). To protect both the state and the defendant, therefore, it is incumbent upon the trial court to raise on its own motion "matters which may significantly promote a just determination of the trial." ABA Standards for Criminal Justice, *Special Functions of the Trial Judge*, Std. 6–1.1; *see also Pinkey*, 548 F.2d at 308.

Where a trial court has accepted a valid waiver of counsel, the court must continue to monitor the proceedings in order to ensure that they do not become so fundamentally unfair as to result in a denial of due process. In *Martinez v. People*, 172 Colo. 82, 470 P.2d 26 (1970), for example, a defendant charged with assault elected to represent himself. Although the evidence warranted an instruction on voluntary intoxication, the defendant failed to request, and the trial court failed to give, the instruction. We held that the court had a duty to protect the rights of a *pro se* defendant by giving the instruction *sua sponte*, and that the failure to protect the defendant from his incompetence was reversible error:

> To sum up, a reading of the transcript indicates that the defendant was so inept that he did not and could not conduct a

---

**3.** Absent conflict of interest, an indigent defendant has no right to a particular attorney. *People*

*v. Shook*, 186 Colo. 339, 527 P.2d 815 (1974).

proper defense for himself. Therefore, the absence of defense counsel in this case and the total ineptness of the defendant to conduct a defense for himself actually resulted in a lack of due process.

172 Colo. at 87, 470 P.2d at 29.

Here, too, the defendant was unable to present a meaningful defense. Although he attempted to raise an intoxication defense, he did so only in argument, apparently unaware of the necessity to present evidence of intoxication before he would be entitled to a jury instruction on the issue. Instead, the defendant's evidence focused irrelevantly on the injuries he sustained while being arrested. The defendant's failure to present a legally significant defense was complicated by a host of other failures. Throughout the trial, the defendant exhibited difficulty in organizing and expressing his thoughts, and presented his arguments in a rambling and incoherent fashion. His fluency in English was suspect; at the close of the prosecutor's case-in-chief the defendant asked for an interpreter because "I don't know how to use right words to express myself to the, to you people."[4]

Under these circumstances, it was incumbent upon the district court to protect the defendant's due process right to a fair trial. One court has observed that

> even after the request to proceed *pro se* has been granted and the defendant has begun his defense, the trial court has a continuing responsibility to watch over the defendant and insure that his incompetence is not allowed to substitute for the obligation of the state to prove its case.

*Pickens v. State,* 96 Wis.2d 549, 292 N.W.2d 601, 611 (1981). Because direct judicial aid in fashioning a defense is inappropriate, both because the trial court must remain neutral, *Pinkey,* 548 F.2d at 309, and because the court is under no obligation to treat the *pro se* defendant any differently than it treats defendants with counsel, *Faretta,* 422 U.S. at 834–35 n. 46, 95 S.Ct. at 2541 n. 46, the best method of protecting the defendant's due process

rights is the appointment of advisory counsel to aid the defendant during trial and to take over the defense should the defendant choose to reassert his right to counsel. Advisory counsel preserves the proper role of the trial court and permits the defendant to pursue his option of self-representation, while simultaneously ensuring that the defendant has been afforded every opportunity to present the defenses available to him. Many courts, including this one, strongly encourage the appointment of advisory counsel as a means of achieving these goals. *United States v. Moore,* 706 F.2d 538, 540 (5th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 183, 78 L.Ed.2d 163 (1983); *United States v. Pilla,* 550 F.2d 1085, 1093 (8th Cir.), *cert. denied* 432 U.S. 907, 97 S.Ct. 2954, 53 L.Ed.2d 1080 (1977); *United States v. Spencer,* 439 F.2d 1047, 1051 (2d Cir.1971); *Cano v. Municipality of Anchorage,* 627 P.2d 660 (Ala.App.1981); *Reliford,* 195 Colo. at 554, 579 P.2d at 1148–49; *Hicks v. State,* 434 A.2d 377, 380 (Del. 1981); *Johnson v. State,* 556 P.2d 1285, 1297 (Okl.Crim.App.1976); *Commonwealth v. Africa,* 466 Pa. 603, 353 A.2d 855, 864 (1976). The role played by advisory counsel is so crucial that he may be appointed and assist the defendant even over the latter's objection. *McKaskle v. Wiggins,* —— U.S. ——, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984); *Faretta,* 422 U.S. at 834–35 n. 46, 95 S.Ct. at 2541 n. 46. In addition, the presence of advisory counsel has been an important factor in saving the validity of constitutionally questionable waivers of counsel. *Goode v. Wainwright,* 704 F.2d 593, 599 (11th Cir.1983); *Bailey,* 675 F.2d at 1302; *United States v. McFadden,* 630 F.2d 963, 972 (3d Cir.1980), *cert. denied* 450 U.S. 1043, 101 S.Ct. 1763, 68 L.Ed.2d 241 (1981); *Rosenthal,* 470 F.2d at 845; *Kelly v. State,* 663 P.2d 967, 969–70 (Ala.App. 1983); *Hsu,* 392 A.2d at 983; *State v. Harvey,* 184 Mont. 423, 603 P.2d 661, 665 (1979); *State v. Chavis,* 31 Wash.App. 784, 644 P.2d 1202, 1207 (1982).

The appointment of advisory counsel is not a matter of constitutional right, but

---

**4.** The court's only response was an offer to explain any unfamiliar words.

rather rests within the discretion of the trial court. *Locks v. Sumner,* 703 F.2d 403, 408 (9th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 338, 78 L.Ed.2d 307 (1983); *United States v. Gigax,* 605 F.2d 507, 517 (10th Cir.1979); *Reliford,* 195 Colo. at 554, 579 P.2d at 1148. The limits of this discretion were set forth in *Reliford:*

> [T]he appointment of advisory counsel is an intermediate measure designed to ensure a fair trial when the trial court determines that the defendant, because of mental or physical problems, is incapable of representing himself, or when it becomes apparent during trial that the defendant is simply unable to handle the task he has undertaken.

195 Colo. at 554, 579 P.2d at 1148. We found no abuse of discretion in *Reliford,* where the trial court did not appoint advisory counsel, because the defendant "articulately presented a well-organized case." *Id.* In contrast, the present situation falls squarely within that class of cases identified in *Reliford* as requiring the appointment of advisory counsel. *Cf. Pickens,* 292 N.W.2d at 611 (where defendant's incompetence deprives him of opportunity to present defense "that is at least prima facie valid," court must rescind permission to proceed *pro se* and assign counsel). Therefore, I would hold that the district court abused its discretion in failing to appoint advisory counsel.

Because this abuse of discretion deprived the defendant of due process, we could affirm this conviction only if we were satisfied "beyond a reasonable doubt that the error did not contribute to the defendant's conviction." *People v. Campbell,* 187 Colo. 354, 358, 531 P.2d 381, 383 (1975). The failure in this case to appoint advisory counsel deprived the defendant of an opportunity to present an intoxication defense that would negate the mental element of the crime charged; therefore, the error is not harmless beyond a reasonable doubt. *See Martinez,* 172 Colo. at 86, 470 P.2d at 28. Moreover, the majority's discussion and resolution of the issues relating to the clothing worn by the defendant during the trial, the use of an alias in the instructions

and the trial court's failure to instruct the jury on lesser included offenses clearly demonstrates that advisory counsel was necessary to protect the record by eliciting necessary facts or making timely and proper objections. I would reverse the judgment on this ground, and, accordingly, I dissent.

I am authorized to say that Justice LOHR and Justice NEIGHBORS join in this concurrence and dissent.