The PEOPLE of the State of
Colorado, Petitioner,

v.

Fidel Helario ARGUELLO, a/k/a John
Clifford, Respondent.

No. 87SC212.

Supreme Court of Colorado,
En Banc.

April 17, 1989.

88

Duane Woodard, Atty. Gen., Charles B. Howe, Deputy Atty. Gen., Richard H. Forman, Sol. Gen., David R. Little, Asst. Atty. Gen., Paul H. Chan, Asst. Atty. Gen., Denver, for petitioner.

Lee D. Foreman, Saskia Jordan, Haddon, Morgan & Foreman, P.C., Denver, for respondent.

MULLARKEY, Justice.

We granted certiorari to review the court of appeals' decision, *People v. Arguello*, 737 P.2d 442 (Colo.Ct.App.1987), which reversed the felony escape conviction of Fidel Helario Arguello. The court of appeals held that the prosecution did not meet its burden of showing by clear and convincing evidence that defendant through his conduct effectuated a waiver of his right to counsel. We disapprove of the court of appeals' language regarding the prosecution's burden but we affirm the court of appeals' holding on the merits. We remand the case to be returned to the district court for a new trial.

I.

On September 4, 1981, while incarcerated on a felony menacing charge, Arguello al-

legedly climbed over the security fence of the exercise yard of the Pitkin County Jail in Aspen and walked away. In March 1984, Arguello was returned to Pitkin County from Nevada on a detainer and was charged with felony escape. The court advised Arguello of his rights and informed him that Calvin Lee, a Deputy Public Defender, would contact him later that day. Arguello indicated that he knew Lee and did not want him as his attorney. Without any inquiry, the judge responded, "If Mr. Lee is not acceptable to you, then there are other alternatives...." Arguello told the judge at this first hearing that he had mental problems and that he spoke "to the spirits all the time." The record contains medical reports that Arguello apparently suffered from paranoia.

In order to make a record of why the Public Defender's office would not be used to represent Arguello, the court held a hearing the next week. At the hearing, Arguello expressed his "massive distrust for the public defender office," and indicated in general terms his inability to work with the public defender office, but made no specific references regarding Lee. The court made no further inquiry except to ask if Arguello wanted an attorney, which Arguello answered in the affirmative. Arguello also asked to be appointed as co-counsel for himself, to which the judge apparently agreed. However, the trial court did not make any express ruling in this regard, did not define what the term "co-counsel" meant in this context, and did not conduct any inquiry into Arguello's understanding and ability to represent himself. That afternoon, the court then appointed another attorney, Tom Crumpacker, to represent Arguello.

Arguello at his next court appearance expressed his dissatisfaction with Crumpacker, claiming that he lacked sufficient ability and experience and that the way he dressed "seemed to be third-rate." Without any inquiry, the court agreed to relieve Crumpacker of his appointment and to substitute Kevin O'Reilly, whom the judge claimed "has probably as good a record as any criminal lawyer in the valley." When appointing O'Reilly, the judge said, "If [Ar-guello] wants [O'Reilly] to be co-counsel, then that's all right with me, but I'm not willing to have Mr. Arguello go to trial without counsel."

Arguello's status as "co-counsel" for himself was never officially established by the judge, and it apparently caused some confusion. At a preliminary hearing two days later on April 4, 1984, the district attorney asked for clarification of Arguello's role as co-counsel, to which the judge replied simply, "For the purposes of discovery, Mr. O'Reilly is lead counsel."

Apparently again dissatisfied with his attorney on May 21, 1984, Arguello at a motions hearing asked that O'Reilly be removed from the case. Arguello claimed that he heard O'Reilly talking with the district attorney about his case in an attempt to "sell him out." Arguello asserted that he had no trust or confidence in O'Reilly and that he could no longer communicate with him. At the same hearing, Arguello also moved to withdraw from his co-counsel status stating,

I would like to withdraw myself as counsel because I've just recently discovered that during any proceeding that I'm representing myself, should I fail to object to anything or should I fail to present certain issues that on appeal I waive them rights, and Your Honor, I don't wish to waive any rights whatsoever.

The judge did not request any additional evidence on Arguello's conflict with O'Reilly but commented that, to his knowledge, O'Reilly had never violated a client's confidence or sold out a client. The judge did not address Arguello's request to withdraw himself as co-counsel but instead warned Arguello: "You have your choice, Mr. Arguello, either make your peace with Mr. O'Reilly or you can represent yourself." Arguello replied by repeating his request for another attorney, to which the judge responded:

I would suggest to you that the picture you're painting of yourself is that you're going to claim that you cannot get along with an attorney and thereby obstruct justice and I guess that sooner or later

we're going to have to draw the line and we've just drawn it; that is, Mr. O'Reilly will assist you or you will—if you refuse to accept the assistance, you will have effectively told the court that you're not going to get along with any attorney. We're close to trial and I don't propose to change your representation at this time.

Arguello denied that he couldn't get along with any lawyer, and claimed that the lawyers he had been appointed did not follow the proper legal strategy for him. The judge reiterated to Arguello:

I'll tell you two choices: Accept Mr. O'Reilly's advice on legal issues without discussing strategy with him, or if you elect to waive that; that is, not stand silent and represent yourself. Think all that over.

Despite the unresolved disagreements between Arguello and O'Reilly, O'Reilly continued to act as co-counsel with Arguello throughout the hearings up until the first scheduled trial date of May 30, 1984.

On the May 30th trial date, Arguello was brought into the courtroom to see a jury orientation film before the trial began. Arguello took the opportunity to insist vehemently that he would neither represent himself nor have O'Reilly represent him. The judge refused to appoint another attorney, and Arguello responded by declaring that he wanted to enter a plea of "not guilty by reason of impaired mental condition." The judge accused Arguello of noncooperation with his attorneys, and Arguello began to speak "in a foreign language," words he claimed were from the spirits. Eventually the judge relented and agreed to postpone the trial so that Arguello could undergo a competency exam at the state hospital.

In June 1984, after returning from the state hospital, Arguello announced to the court that he no longer wished to represent himself and that he wanted O'Reilly as his lawyer. The court complied, saying it was now "official" that Arguello was not representing himself any more.

In spite of Arguello's ostensible change of heart regarding his attorney, O'Reilly filed a motion on July 18, 1984, to withdraw from further representation of Arguello because of "a conflict." O'Reilly explained the reasons for his withdrawal to the judge:

[Arguello has] accused me of working with the D.A. against him, working with the Court against him. It's just cumulative. There's no way that I can continue working with him, give him any kind of effective assistance as counsel.... I just don't think because of holding a license to practice that I have to subject myself to physical abuse like this and verbal abuse.... I just don't think it's appropriate for me to continue, and I don't think it's healthy for me.

Arguello protested, saying he never verbally or physically threatened O'Reilly, but that he didn't trust O'Reilly. The judge reiterated his opinion that O'Reilly was a good attorney but did not question O'Reilly about the factual basis for his motion to withdraw. The court concluded by announcing to Arguello that he had lost his right to an attorney:

What you need to understand, Mr. Arguello, is that you have elected to go forward without the best counsel this court can afford you. I'm going to grant Mr. O'Reilly's Motion to Withdraw. However, you should also understand that in making that election, we're still going to trial.

A heated exchange then ensued, with Arguello directing a stream of profanity at the judge which continued for eight pages of the transcript. Arguello resisted the sheriff's attempts to subdue him, and the judge held him in contempt.

Later that day Arguello appeared before the judge to apologize and the court accepted his apology as purging the contempt. At the conclusion of the hearing, Arguello again stated, "I need a lawyer I feel, Judge." Arguello followed up his request with a written motion asking that counsel be appointed for him. From this point on and throughout the trial, the court denied or ignored Arguello's requests for counsel. On the day of trial, prior to jury selection when it became clear that Arguello was

going to trial without an attorney, Arguello continued his protest saying,

> Your honor, I don't wish to represent myself and I won't. I flat refuse to. People go ahead and do the railroad number and I won't say nothing. I'm not going to waive my rights or anything. I'm not an attorney, and I don't see how I should be forced to play the role of the attorney. The Sixth Amendment of the United States guaranteed—

After the judge tried to explain to Arguello the procedure for selecting the jury, Arguello inveighed, "I don't understand all these legal proceedings that you're fixing to throw me into. I don't understand how to question these people, I've never been to a jury trial in my life. I've never seen empaneling of a jury, next to Perry Mason on T.V."

As the trial commenced, Arguello repeated his desire for an attorney to the prospective jurors. When Arguello attempted to *voir dire* the jury, he told them that he had been forced to trial *pro se* against his will, and that he wanted an attorney. During opening statement, he said that he wanted a lawyer and claimed that he had no witnesses because he did not know how to subpoena them. When the time came for Arguello to offer evidence, he again asked for a lawyer, and the judge ignored his request and stated that the court "deem[ed] the Defendant's case to have been rested."

Arguello's repeated requests for counsel became a central issue in his trial and several jurors expressed concern over this. On two separate occasions, potential jurors asked the court why Arguello was unrepresented, and over Arguello's objections the judge explained that "Mr. Arguello has decided to represent himself and not use the services of an attorney." The judge discharged one potential juror because the juror expressed his concern that Arguello was without counsel. After the jury went into deliberation, it twice sent out interrogatories to the judge. The first question was: "Why did Arguello not have proper legal defense?" Over Arguello's objections, the court wrote back, "The Court may not answer the question you have asked. The only issue before you is whether the defendant is guilty or not guilty of the offense charged." The jury apparently was not satisfied with this answer and sent out another question: "According to the law, if a Defendant is dissatisfied with counsel, is another attorney made available to the Defendant?" The judge answered the question in a similar manner to the first, admonishing the jury to focus only on the elements of the crime of escape, and not on the fact that Arguello was without counsel at trial.

While the jury was deliberating, the interactions between Arguello and the judge erupted into another heated exchange in which Arguello repeatedly requested an attorney and the judge ultimately held Arguello in contempt of court. On August 23, 1984, the jury returned a guilty verdict.

Two weeks later, at the beginning of the sentencing hearing, Arguello again said he needed a lawyer. To this the court replied,

> From the Court's viewpoint, this is the way things went: you declined the services of the Public Defender's Office; you declined the services of Mr. Crumpacker, whom I would not have sent had I not considered him an able attorney; and then after a series of matters, Mr. O'Reilly withdrew. I was persuaded that Mr. O'Reilly, with his experience, and I must tell you honestly that I have never encountered a defendant that Mr. O'Reilly couldn't get along with before or that couldn't get along with Mr. O'Reilly. I concluded at that time that we needed to go to trial and that I was not going to continue to appoint counsel for you until we got you to trial. So we did go to trial, if that was an error on my part, then it's well-documented and the error is there.

Arguello was sentenced to three years in Canon City, to run consecutive to his Nevada sentence. Arguello appealed his conviction with the assistance of yet another court-appointed attorney, Lee Foreman. The court of appeals reversed, holding that the trial court erred by failing to inform Arguello of the consequences of self-repre-

sentation and by failing to warn him in advance that his conduct could constitute an implied waiver of counsel.

We granted certiorari to clarify what standard applies in evaluating the validity of a waiver of the right to counsel, and to determine whether Arguello through his conduct impliedly waived his right to counsel.

## II.

We begin by considering the standard for appellate review of the validity of an in-court waiver of the right to counsel. On appeal, when a defendant asserts that an in-court waiver of a fundamental constitutional right was invalid, the prosecution must establish a prima facie case that the waiver was effective. *People v. Norman*, 703 P.2d 1261, 1271 (Colo.1985); *People v. Curtis*, 681 P.2d 504, 515 n. 16 (Colo.1984); *People v. Fulton*, 754 P.2d 398, 400 (Colo. Ct.App.1987). Once a prima facie case has been established, the defendant may overcome it by presenting "evidence from which it could be reasonably inferred that the waiver was *not* voluntary, knowing and intentional." *Norman*, 703 P.2d at 1271 (emphasis added).

Accordingly, the court of appeals erred in stating that, on appeal, the prosecution must show "by clear and convincing evidence" that the defendant waived the right to counsel and we overrule the court of appeals' decision in this respect.

## III.

We next consider whether under the facts of this case, the prosecution established a prima facie case of a voluntary, knowing and intelligent waiver of the right to counsel by Arguello.

### A.

We preface our analysis with a review of the law of the right to counsel and the correlative right to self-representation. The fundamental right to counsel is guaranteed by the Sixth Amendment to the United States Constitution, and is considered essential to a fair trial. *Argersing-*

*er v. Hamlin*, 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972); *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); *Anaya v. People*, 764 P.2d 779 (Colo.1988). Although an indigent criminal defendant has an absolute right to be represented by counsel, this does not mean a defendant has a right to demand a particular attorney. *Morris v. Slappy*, 461 U.S. 1, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983); *Thomas v. Wainwright*, 767 F.2d 738, 742 (11th Cir.1985), *cert. denied*, 475 U.S. 1031, 106 S.Ct. 1241, 89 L.Ed.2d 349 (1986); *United States v. Peister*, 631 F.2d 658, 661 (10th Cir.1980), *cert. denied*, 449 U.S. 1126, 101 S.Ct. 945, 67 L.Ed.2d 113 (1981). The right to counsel guarantees only competent representation, and does not necessarily include "a meaningful attorney-client relationship." *Morris v. Slappy*, 461 U.S. at 14, 103 S.Ct. at 1617–1618. Motions for discharge and substitution of court-appointed counsel "cannot be manipulated in such a manner as to impede the efficient administration of justice." *People v. Barnes*, 636 P.2d 1323, 1325 (Colo.Ct.App.1981); *see also McMahon v. Fulcomer*, 821 F.2d 934, 942 (3d Cir.1987).

As a corollary to the Sixth Amendment's right to counsel, a defendant has the alternative right to self-representation. *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). The Colorado Constitution reinforces this right, stating that "the accused shall have the right to appear and defend in person." Colo. Const. art. II, § 16; *People v. Romero*, 694 P.2d 1256, 1263 (Colo.1985). A defendant, however, does not have a right to demand "hybrid" or mixed representation by both counsel and the defendant, although a trial court in its discretion may permit this. *United States v. Tarantino*, 846 F.2d 1384, 1420 (D.C.Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 108, 102 L.Ed.2d 83 (1988); 2 W. LaFave & J. Israel, *Criminal Procedure* § 11.5(f) (1984). A defendant's right to self-representation is conditioned on the requirement that a defendant "has an intelligent understanding of the consequences of so doing." *People v. Moody*, 630 P.2d 74, 77 (Colo.1981).

Thus, before a defendant is allowed to proceed *pro se,* the defendant first must effect a valid waiver of the right to counsel. *Faretta,* 422 U.S. at 836, 95 S.Ct. at 2541–2542.

A waiver is "an intentional relinquishment or abandonment of a known right or privilege." *King v. People,* 728 P.2d 1264, 1268 (Colo.1986) (quoting *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938)). A trial court's determination that a defendant waived the constitutional right to counsel will be upheld if the record affirmatively establishes that the defendant knowingly and intelligently waived that right. *See King v. People,* 728 P.2d at 1269–70; *People v. Romero,* 694 P.2d at 1264.

Courts have set forth several general principles for assessing the validity of a waiver. Courts must indulge every reasonable presumption against finding a waiver of the fundamental right to counsel. *Johnson v. Zerbst,* 304 U.S. at 464, 58 S.Ct. at 1023; *United States v. Williamson,* 806 F.2d 216 (10th Cir.1986); *United States v. Gipson,* 693 F.2d 109 (10th Cir.1982), *cert. denied,* 459 U.S. 1216, 103 S.Ct. 1218, 75 L.Ed.2d 455 (1983). Where the record is silent regarding the issue of waiver, no presumption can arise. *Carnley v. Cochran,* 369 U.S. 506, 82 S.Ct. 884, 8 L.Ed.2d 70 (1962); *Williamson,* 806 F.2d at 219. Any doubts regarding the waiver must be resolved in defendant's favor. *Williamson,* 806 F.2d at 220.

A waiver may take the form of an express statement by the accused relinquishing the right to counsel, or under certain circumstances, a waiver can be implied from the facts of the case. *See North Carolina v. Butler,* 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979). The United States Supreme Court has held that "an explicit statement of waiver is not invariably necessary to support a finding that the defendant waived ... the right to counsel;" in some cases waiver may be inferred from the actions and words of the defendant. *Id.* at 375–76, 99 S.Ct. at 1758–59.

An implied waiver of counsel resulting from a defendant's misconduct is more accurately described as a *forfeiture* of the right rather than a deliberate and informed decision to waive the right. *See* P. Westen, *Away From Waiver: A Rationale for the Forfeiture of Constitutional Rights in Criminal Procedure,* 75 Mich.L.Rev. 1214, 1239 n. 50 (1977); 2 W. LaFave & J. Israel, *Criminal Procedure* § 11.3(c) (1984 & Supp.1988). However, most courts use the terminology of "implied waiver" and apply the legal standards for a waiver in determining whether a defendant's disruptive or uncooperative behavior amounted to a loss of the right to counsel. For example, in *Illinois v. Allen,* 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970) the Court held that the defendant's disruptive and stubbornly defiant conduct resulted in the loss of his right to be present at his own trial, after he was adequately warned of the consequences of his conduct by the trial judge. In *Thomas v. Wainwright,* 767 F.2d at 743, the Eleventh Circuit held that at some point, a defendant may waive his right to counsel by his unreasonable refusal to communicate with his court-appointed attorney. *See also People v. Moody,* 630 P.2d at 79 (defendant lost right to represent self by his adamant and unreasonable demand for new jury panel); *People v. Litsey,* 192 Colo. 19, 555 P.2d 974 (1976) (defendant's failure to make any effort to retain counsel after discharging his retained attorney constituted waiver of right to counsel).

This court, in *King v. People,* articulated the following test for an implied waiver of counsel:

> In order for a court to conclude that an accused has impliedly waived counsel, the record as a whole, including the reasons proffered by the defendant for not having counsel, must show that the defendant knowingly and willingly undertook a course of conduct that evinces an unequivocal intent to relinquish or abandon his right to legal representation.

728 P.2d at 1269. The defendant in *King* had failed to secure retained or appointed counsel before trial despite the trial court's repeated warnings that the trial date would not be continued. The trial court forced the defendant to trial *pro se* without a

careful inquiry into the defendant's under-standing of his right to counsel. We held that this was reversible error because, without an adequate advisement from the trial court, the defendant's conduct could not amount to an implied waiver of his right to counsel.

A defendant's lack of good faith in work-ing with appointed counsel, including an unreasonable refusal to cooperate with counsel or an unreasonable request for substitution of appointed counsel, can be the first step toward waiver of counsel. A request for new counsel is ordinarily not a waiver of the right to counsel, *Meyer v. State*, 49 Md.App. 300, 431 A.2d 738, 742 (1981), but an unwarranted request or a request made without good cause may lead to waiver of the right. *See* 2 J. Cook, *Constitutional Rights of the Accused* § 7:13 at 306 (2d ed. 1986).

■ For this reason, when an indigent defendant voices objections to court-ap-pointed counsel, the trial court has the obli-gation to inquire into the reasons for the dissatisfaction. *United States v. Padilla,* 819 F.2d 952, 956 n. 1 (10th Cir.1987); *Thomas v. Wainwright,* 767 F.2d at 741. If the defendant can establish "good cause, such as a conflict of interest, a complete breakdown of communication or an irrecon-cilable conflict which leads to an apparently unjust verdict," the court is required to substitute new counsel. *McKee v. Harris,* 649 F.2d 927, 931 (2d Cir.1981), *cert. de-nied,* 456 U.S. 917, 102 S.Ct. 1773, 72 L.Ed. 2d 177 (1982). Before change of counsel is warranted the trial court must verify that the defendant has "some well founded rea-son for believing that the appointed attor-ney cannot or will not completely represent him." 2 W. LaFave & J. Israel, *Criminal Procedure* 37 (1984). A trial judge may properly inquire into the circumstances without infringing on the attorney-client privilege to determine whether substitution of counsel is warranted. *See People v. Schultheis,* 638 P.2d 8 (Colo.1981).

The timeliness of defendant's request for new counsel is a relevant consideration. Especially when a defendant makes an un-timely request for new counsel on the eve of trial or under circumstances which are likely to result in a continuance, the judge must carefully inquire into the defendant's reasons for the request to determine whether they are sufficiently substantial to justify postponing the trial. *McMahon v. Fulcomer,* 821 F.2d at 942. A defendant should not be allowed to use a motion for substitution of counsel as a delay tactic, but on the other hand, "the interest in judicial efficiency cannot override. the fun-damental right of an accused to be repre-sented by counsel." *King,* 728 P.2d at 1270.

■ Once the trial court appropriately has determined that a substitution of coun-sel is not warranted, the court can insist that the defendant choose between contin-ued representation by existing counsel and appearing *pro se. United States v. Gal-lop,* 838 F.2d 105, 109 (4th Cir.1988), *cert. denied,* — U.S. ——, 108 S.Ct. 2858, 101 L.Ed.2d 895 (1988); *United States v. Padil-la,* 819 F.2d at 955. In this context, a defendant must be given "a clear choice" between present counsel and waiver of counsel. *Padilla,* 819 F.2d at 955. A de-fendant who then refuses without good cause to proceed with able appointed coun-sel has effected a "voluntary" waiver. *Gallop,* 838 F.2d at 109. However, even if the choice to proceed *pro se* is "voluntary," the waiver is not valid until the court en-sures that the waiver is made *knowingly* and *intelligently.*

A waiver cannot be knowing and intelli-gent unless the record clearly shows that the defendant understands

> the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and cir-cumstances in mitigation thereof, and all other facts essential to a broad under-standing of the whole matter.

*Von Moltke v. Gillies,* 332 U.S. 708, 724, 68 S.Ct. 316, 323, 92 L.Ed. 309 (1948) (plurality opinion), *quoted in United States v. Padil-la,* 819 F.2d at 957. Other factors con-sidered by courts in determining whether the waiver was knowing and intelligent in-clude whether the defendant understood

the requirement of complying with the rules of procedure at trial, whether the exchange between the defendant and the judge consisted merely of pro forma answers to pro forma questions, and whether the defendant was attempting to delay or manipulate the proceedings. *Fitzpatrick v. Wainwright,* 800 F.2d 1057, 1067 (11th Cir.1986). In each situation, the validity of the waiver must be determined on the basis of the particular facts and circumstances of the case, including the background, experience, and conduct of the defendant. *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938); *Williamson,* 806 F.2d at 219; *King,* 728 P.2d at 1268. *See* Annotation, *Accused's Right to Represent Himself in Criminal Proceeding—Modern State Cases,* 98 A.L.R.3d 13, § 11[c] (1980 and 1988 Supp.) (annotating cases which held that waiver of counsel not knowingly and intelligently made).

The trial court has the responsibility of ensuring the validity of a waiver by properly advising the accused. The court must confirm that the accused is making a knowing and informed decision to forego "many of the traditional benefits associated with the right to counsel." *Faretta,* 422 U.S. at 836, 95 S.Ct. at 2541–48; *see also People v. Lucero,* 200 Colo. 335, 340, 615 P.2d 660, 663 (1980). The United States Supreme Court articulated the gravity of the trial court's affirmative duty in this situation:

> "The constitutional right of an accused to be represented by counsel invokes, of itself, the protection of a trial court, in which the accused—whose life or liberty is at stake—is without counsel. This protecting duty imposes the serious and weighty responsibility upon the trial judge of determining whether there is an intelligent and competent waiver by the accused." To discharge this duty properly in light of the strong presumption against waiver of the constitutional right to counsel, a judge must investigate as long and as thoroughly as the circumstances of the case before him demand.

*Von Moltke v. Gillies,* 332 U.S. at 723, 68 S.Ct. at 323 (quoting *Johnson v. Zerbst,* 304 U.S. at 465, 58 S.Ct. at 1023). The trial court's responsibility then is to ensure that a defendant is "made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" *Faretta,* 422 U.S. at 836, 95 S.Ct. at 2541–43 (quoting *Adams v. United States,* 317 U.S. 269, 279, 63 S.Ct. 236, 241–242, 87 L.Ed. 268 (1942)).

This court has not ruled on the question of what a judge must do to ensure that the defendant's waiver of the right to counsel was voluntary, knowing and intelligent. The federal courts have taken various approaches. In the First Circuit, the trial court should conduct a more specific formalized inquiry before a waiver is recognized, but the reviewing court also considers all the circumstances of the case. *United States v. Hafen,* 726 F.2d 21 (1st Cir.1983), *cert. denied,* 466 U.S. 962, 104 S.Ct. 2179, 80 L.Ed.2d 561 (1984). In the Third Circuit, a trial court must make a "searching inquiry" on the record and failure to do so is reversible error. *United States v. Welty,* 674 F.2d 185, 189 (3d Cir. 1982). In the Fourth Circuit, the trial judge can "determine the sufficiency of the waiver from the record as a whole rather than from a formalistic, deliberate, and searching inquiry." *United States v. Gallop,* 838 F.2d at 109–10. The Sixth Circuit now requires trial judges to follow the model inquiry set forth in 1 *Bench Book for United States District Judges,* 1.02–2 to –5 (3d ed. 1986). *United States v. McDowell,* 814 F.2d 245 (6th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 478, 98 L.Ed.2d 492 (1987).

■ In our view, the most reasonable approach is to require that the trial court conduct a specific inquiry on the record to ensure that the defendant is voluntarily, knowingly and intelligently waiving the right to counsel. *See People v. Mozee,* 723 P.2d 117, 122 (Colo.1986) (trial judge has responsibility to ascertain validity of defendant's waiver of right to testify and this determination should appear on the record). The *Colorado Trial Judges' Benchbook,* pages 2–23 through 2–24 (Sept.1981), reprinted in the Appendix, provides a list of

questions that a trial judge should ask the defendant before allowing the defendant to waive the right to counsel. A court's failure to comply substantially with this requirement does not automatically render the waiver invalid, but is an exception which should rarely be invoked. *See Harding v. Lewis*, 834 F.2d 853, 857 (9th Cir. 1987), *cert. denied*, —— U.S. ——, 109 S.Ct. 182, 102 L.Ed.2d 151 (1988). On appeal, a reviewing court will look for the on-the-record advisement, but also will consider the totality of the circumstances in the whole record in ascertaining the validity of the waiver.

### B.

■ Applying these principles to the case before us, we find no express advisement by the court and no express waiver by the defendant of his right to counsel. Accordingly, we review the totality of the circumstances to determine if the defendant by his conduct effected a voluntary, knowing and intelligent waiver of his right to counsel. Our review of the record in this situation must be made "without speculation" in light of the strong presumption against waiver. *Sanchez v. Mondragon*, 858 F.2d 1462, 1467 (10th Cir.1988), quoting *U.S. v. Padilla*, 819 F.2d at 957. *See also Rice v. People*, 193 Colo. 270, 271, 565 P.2d 940, 941 (1977); *People v. Evans*, 44 Colo. App. 288, 612 P.2d 1153, 1155 (1980) (determination of waiver must be "matter of certainty and not implication").

The prosecution contends that Arguello impliedly waived his right to counsel through his obstreperous and dilatory conduct. We agree that Arguello's conduct taken as a whole—his repeated requests for change of attorneys without good cause, his non-cooperation with his attorneys, his dilatory tactics, and the prolonged verbal abuse he directed at the judge when he was denied a change of counsel—could amount to a "voluntary" waiver of his right to counsel. However, we cannot find a valid waiver because the record does not establish that the implied waiver was knowing and intelligent.

In reviewing the record to determine the adequacy of the trial court's advisement of Arguello, we observe that the trial court properly advised Arguello of the charges against him, the possible penalties, and his right to counsel in general. However, despite the many occasions on which questions arose about Arguello's representation and his co-counsel status, the trial court made no attempt to question Arguello about his understanding of what it would mean to proceed without counsel. For example, the judge did not inquire into Arguello's educational background, his familiarity with the legal system and the rules of evidence and criminal procedure, or his understanding of the many risks of self-representation. From the record of the trial, it is apparent that Arguello did not understand how to have witnesses subpoenaed, did not know how to voir dire the jury, and did not understand how to submit appropriate jury instructions.

In addition, although the court was put on notice of Arguello's susceptibility to mental problems, through medical reports in the record and through Arguello's inappropriate behavior in the courtroom, the judge did not inquire into how Arguello's mental condition might affect his understanding of the consequences of waiver of counsel. Instead the court forced the emphatically protesting Arguello to represent himself at trial and at the sentencing hearing. Arguello did undergo a psychiatric examination before trial and was found competent to stand trial, but this finding is not synonymous with the level of inquiry and degree of competency necessary for a valid waiver of counsel. *See United States v. McDowell*, 814 F.2d at 250 ("degree of competency required to waive counsel is 'vaguely higher' than the competency required to stand trial").

Admittedly the court did make several statements warning Arguello that he would have to work with O'Reilly or represent himself, but these warnings lacked the specificity necessary to enable us to conclude that Arguello fully understood the implications of his conduct. *See Sanchez v. Mondragon*, 858 F.2d at 1467 (judge's warnings to defendant, including warning

that *pro se* defendants usually lose, was insufficient to establish knowing and intelligent waiver of counsel). The judge merely warned Arguello, "either you make your peace with Mr. O'Reilly or you can represent yourself." The judge then continued to permit Arguello to act as co-counsel for himself, without any inquiry to ensure that Arguello chose to represent himself "with his eyes open" and understood the hazards of self-representation.

Arguello's status as co-counsel or *pro se* was never clarified or decisively determined by the court, and the trial court permitted Arguello to alter his *pro se* status as freely as he was permitted to dispose of his attorneys. The court never made it clear whether Arguello was acting in a hybrid representation situation, or whether O'Reilly was merely stand-by counsel. Several weeks before trial, the judge agreed to Arguello's request to withdraw as co-counsel and said it was "official" that Arguello was not representing himself. Within one month after ruling that Arguello was not proceeding *pro se*, the court allowed O'Reilly to withdraw as counsel for Arguello, refused to appoint new counsel, and forced Arguello to act as his own attorney. In so doing the court effectuated a forfeiture of Arguello's fundamental right to counsel without, at any time, adequately explaining to Arguello the potential consequences of his behavior. As the court of appeals correctly pointed out, the court merely told Arguello, *after the fact*, that he had by his conduct elected to proceed without counsel.

Arguello never expressly waived his right to counsel but indeed clearly stated his desire for counsel at every possible opportunity and disputed the judge's statement that he could not get along with any attorney. We recognize that a defendant's spoken words may be contradicted by his conduct. However, before a reviewing court can find a valid implied waiver based on conduct, there must be ample, unequivocal evidence in the record that the defendant was advised properly in advance of the consequences of his actions. In sum, the record before us does not provide the requisite showing that Arguello knowingly acted in a manner which would meet the test for an implied waiver of counsel as set forth in *King* of demonstrating "an *unequivocal* intent to relinquish or abandon his right to legal representation." *King*, 728 P.2d at 1269 (emphasis added). Arguello's conduct, though far from exemplary, cannot be considered a valid waiver of his right to counsel in the absence of proof that he was adequately informed so as to understand the consequences of his actions.

Finally, in determining whether the denial of Arguello's right to counsel constitutes reversible error, we apply the test articulated by the United States Supreme Court: "Sixth Amendment violations that pervade the entire proceeding" of the criminal prosecution and "cast so much doubt on the fairness of the trial process," as a matter of law, "can never be considered harmless." *Satterwhite v. Texas*, — U.S. —, 108 S.Ct. 1792, 1797, 100 L.Ed.2d 284 (1988); *see also Sanchez v. Mondragon*, 858 F.2d at 1468 (applying *Satterwhite* test to find reversible error in trial court's inadequate advisement to defendant before alleged waiver of right to counsel). In this case, Arguello's repeated requests for counsel disrupted the proceedings several times. Arguello's *pro se* status clearly concerned and distracted the jury, as evidenced by the jurors' questions during voir dire and the jury's two interrogatories sent out during deliberation. This error undoubtedly tainted the whole trial and hence, renders the conviction invalid. On the basis of the record before us, it is clear that this Sixth Amendment violation constituted reversible error. Accordingly, we affirm the court of appeals' holding that Arguello's right to counsel had been violated, and remand the case for a new trial.

## APPENDIX

### COLORADO TRIAL JUDGES BENCHBOOK

Sept. 1981

*CHAPTER 7. Waiver Of Counsel*

A defendant in a criminal case ha[s] a right to be represented by himself, and [to]

proceed without counsel. However, extreme caution should be used in obtaining a waiver from the defendant who is proceeding without counsel following questioning as suggested.

The judge must inquire of a defendant who appears in court without counsel if he desires counsel. If the defendant indicates he desire to proceed without assistance of counsel, the following inquiry is suggested:

1. Do you understand that you have the right to be represented by counsel throughout these proceedings?

2. Do you understand that if you cannot afford an attorney that one will be provided to you free of charge?

3. Do you understand I will appoint counsel if you want an attorney to represent you?

4. Do you understand the charge against you is _____, and it carries a penalty of _____ in the Department of Corrections (or County Jail)?

5. Do you have any legal training?

6. How far have you gone in school?

7. Are you under the influence of any drug, medication or alcohol that would affect your understanding of these proceedings?

8. Do you wish to consult with the public defender before you make a decision to waive counsel and represent yourself?

9. Do you understand criminal law is a complicated area, and that an attorney trained in this field could be of great help in preparing and representing your defense?

10. Do you understand that you have a right to remain silent and that anything you say can be used against you in court?

11. Would you request [that] the court appoint counsel to advise you?

12. You should understand you have a right to represent yourself, but by doing so, you take a great risk of not properly presenting your case.

13. Do you understand you have a right to confront the witnesses against you and cross-examine them?

14. Do you understand you have a right to have witnesses you choose compelled to appear and testify in your behalf?