23CA0044 Peo v Martinez-Hernandez 03-26-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA0044
Mesa County District Court No. 18CR627
Honorable Gretchen B. Larson, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Pedro Martinez-Hernandez,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division V
Opinion by JUDGE WELLING
Grove and Johnson, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced March 26, 2026

---

Philip J. Weiser, Attorney General, Lisa K. Michaels, Senior Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Lucy H. Deakins, Alternate Defense Counsel, Denver, Colorado, for Defendant-Appellant

¶ 1    Defendant, Pedro Martinez-Hernandez, appeals his judgment of conviction for two felonies and two traffic infractions after representing himself at trial.  We affirm.

## I.    Background

¶ 2    On March 30, 2018, Trooper Christian Bollen was patrolling Mesa County, Colorado.  While on Interstate Highway 70, he observed the driver of a black minivan do a "double take" when he saw Trooper Bollen.  Trooper Bollen started following the minivan and observed it travel in the left lane without passing any vehicles for about three miles.  He also observed the vehicle's right tires cross over the right, dotted lane line.  He initiated a traffic stop of the vehicle and identified the only occupant as Martinez-Hernandez.

¶ 3    Martinez-Hernandez said he had flown from New York to Los Angeles and was driving from Los Angeles to Michigan to see his son.  After confirming that the minivan was a rental car rented under someone else's name and seeing that the GPS had the destination as Bronx, New York, Trooper Bollen had suspicion that Martinez-Hernandez was carrying drugs in the minivan.  He asked another trooper to come with a drug-sniffing dog.  The dog arrived and alerted to the presence of narcotics in the minivan.  After a

search of the vehicle, the troopers found about seven kilograms of a substance wrapped in cellophane behind a rear trunk panel in the minivan. After field testing, the substance produced a presumptive positive result for cocaine.

¶ 4    Martinez-Hernandez was arrested and charged with possession of cocaine. After further laboratory testing, the substance turned out to be heroin, and the People amended the complaint.

¶ 5    Leading up to his trial, Martinez-Hernandez repeatedly expressed his dissatisfaction with his four court-appointed attorneys — first his public defenders and then his alternate defense counsel (ADC) — leading to three of them withdrawing. He proceeded pro se at trial. The jury convicted him of possession with intent to distribute a controlled substance (heroin), possession of a controlled substance (heroin), improper use of a passing lane, and improper lane change. The trial court sentenced him to sixteen years in the custody of the Department of Corrections.

## II.    Issues on Appeal

¶ 6    Martinez-Hernandez raises five arguments on appeal. He contends that (1) the court erred by concluding that he knowingly

and intelligently waived his right to counsel; (2) the court erred by not appointing him advisory counsel; (3) the court erred by empaneling three biased jurors; (4) the prosecutor committed several instances of misconduct; and (5) there was insufficient evidence to convict him because a fabricated video exhibit was admitted at trial. Martinez-Hernandez also contends that the cumulative effect of these errors requires reversal. We consider and reject each contention in turn below.

### A. Knowing and Intelligent Waiver of Counsel

¶ 7 We first address Martinez-Hernandez's contention that the trial court erred by accepting Martinez-Hernandez's waiver of counsel because he didn't make it intelligently or knowingly. We disagree.

#### 1. Additional Facts

¶ 8 Over the course of the proceedings, four different attorneys represented Martinez-Hernandez. The first two were public defenders and the last two were ADC. The second public defender, Michelle Sages, began representing Martinez-Hernandez after his first public defender moved away from Mesa County. Thereafter, there were six hearings about the status of Martinez-Hernandez's

3

representation that eventually led to Martinez-Hernandez representing himself at trial. We briefly describe those six hearings.

¶ 9 *First hearing.* On January 2, 2019, the trial court held an ex parte hearing because Martinez-Hernandez said that he no longer wanted Sages to represent him.[1] After first explaining the charges and possible punishments, the trial court heard from Martinez-Hernandez and Sages about the conflict between them. In the end, the court didn't allow Sages to withdraw. In doing so, the court explained to Martinez-Hernandez that he didn't "have a real good understanding of the criminal justice system; that if [he] were to try and represent [him]self in this matter, [he] would be a poor advocate for [him]self and [he] might end up wrongfully convicting [him]self."

¶ 10 *Second hearing.* On April 19, 2019, at the trial court's request, a different district court judge, Judge Gurley, conducted an

---

[1] Although all six of the hearings addressed, at least to some degree, Martinez-Hernandez's dissatisfaction with his court appointed-counsel and, therefore, would have seemed to implicate *People v. Bergerud*, 223 P.3d 686, 695 (Colo. 2010), neither counsel nor the court ever referred to the hearings as *Bergerud* hearings or otherwise cited the case. We, therefore, don't refer to any of the hearings as *Bergerud* hearings.

ex parte hearing because Martinez-Hernandez again said that he wanted new counsel. Judge Gurley denied his request.

¶ 11     *Third hearing.*  On August 30, 2019, the trial court conducted another ex parte hearing because Martinez-Hernandez alleged that there was a conflict between him and Sages. Martinez-Hernandez explained to the court that he believed Sages was conspiring with the prosecutor and that, as a result, he didn't trust her. The court allowed Sages to withdraw and, after confirming that Martinez-Hernandez still wanted to be represented by an attorney, appointed ADC to represent him. ADC Ashley Whitham later entered her appearance.

¶ 12     *Fourth hearing.*  On February 20, 2020, the trial court requested that Judge Gurley conduct another ex parte hearing because Martinez-Hernandez said that he no longer wanted Whitham to represent him. Judge Gurley denied his request, and Whitham continued to represent Martinez-Hernandez.

¶ 13     *Fifth hearing.*  On November 4, 2020, Judge Gurley, again at the trial court's request, presided over a third ex parte hearing based on an alleged breakdown in the relationship between Whitham and Martinez-Hernandez. At this hearing, Martinez-

Hernandez requested to proceed pro se. After Judge Gurley struggled to complete a waiver of counsel advisement under *People v. Arguello*, 772 P.2d 87 (Colo. 1989), Judge Gurley found that Martinez-Hernandez hadn't made a knowing and intelligent waiver of counsel. Whitham stayed on as Martinez-Hernandez's counsel. But that evening, Whitham filed a motion to withdraw.

¶ 14    At a pretrial readiness conference the next day, Martinez-Hernandez again stated that he wanted to proceed pro se. The trial court again denied the request and gave him the choice of proceeding to trial with Whitham or getting a new attorney and continuing the jury trial to a later date. The court let him think it over until the next appearance. On November 10, 2020, the trial court continued the then-scheduled jury trial due to the COVID-19 pandemic. So the court granted Whitham's motion to withdraw and appointed another ADC, Dan Shaffer. Less than a month later, Shaffer filed a motion to withdraw.

¶ 15    *Sixth hearing.* On December 7, 2020, the trial court addressed Shaffer's motion to withdraw. Martinez-Hernandez again requested to proceed pro se. The trial court then asked Martinez-Hernandez

questions to determine if he was able to knowingly, intelligently, and voluntarily waive his right to counsel.

¶ 16     At the outset of the inquiry, the trial court displayed the amended complaint to Martinez-Hernandez.  It also read each count and explained the possible punishments.  Then, it displayed the Colorado Bureau of Investigation (CBI) Forensics Services Division's laboratory report, which showed the testing results of the controlled substance found in the minivan and its weight.  After going through the charges against him and their possible punishments, the court asked Martinez-Hernandez three times if he understood that if the jury found him guilty of either count one or count two, he would face a mandatory prison sentence.  After the third time, Martinez-Hernandez responded that he understood.  Similarly, the trial court informed Martinez-Hernandez two times that he had the right to be represented by an attorney.  After Martinez-Hernandez again didn't respond that he understood this right, the trial court informed him that because he couldn't "afford an attorney . . . right now," it had "appointed Mr. Shaffer to represent you at no cost to you."

¶ 17     Then the trial court asked Martinez-Hernandez why he wanted to proceed pro se.  After hearing Martinez-Hernandez express his

dissatisfaction with Shaffer, the trial court proceeded with an *Arguello* advisement. The trial court asked if Martinez-Hernandez had any legal training; he responded that he didn't. He also told the court that he went to high school but didn't graduate.

¶ 18    Ultimately, before granting Martinez-Hernandez's request to proceed pro se, the trial court asked him if he understood that

- "criminal law is a complicated area, and an attorney trained in criminal law would be of great help to [him] in preparing for [his] case and . . . representing [him] in [his] case";

- he had the right to remain silent;

- if he decided not to testify at trial, his silence couldn't be used against him;

- he had the right to testify at trial;

- he had the right to question witnesses who testified against him;

- he had the right to have witnesses testify on his behalf; and

- he had the right to represent himself, but by doing so, he ran a great risk of not properly presenting his case to the jury.

¶ 19    To each inquiry, Martinez-Hernandez responded that he understood.

¶ 20    The trial court then asked Martinez-Hernandez if he wanted advisory counsel; Martinez-Hernandez declined.  He confirmed that he wasn't under the influence of any alcohol, drugs, or medications; that he didn't wish to speak privately with Shaffer before waiving his right to counsel; and that he did indeed want to represent himself and waive his right to counsel.

¶ 21    Based on this colloquy, the trial court found that Martinez-Hernandez had knowingly, intelligently, and voluntarily waived his right to counsel.  The court expressed "serious concerns about Mr. Martinez-Hernandez's ability to represent himself at trial" but observed that he had a "right, an absolute right, to represent himself if he wants to do so, but must live with the consequences of that decision."  Martinez-Hernandez, ultimately, represented himself at trial.

                2.    Legal Principles and Standard of Review

¶ 22    The United States and Colorado Constitutions guarantee a criminal defendant the right to the assistance of counsel.  *See* U.S. Const. amends. VI, XIV; Colo. Const. art. II, § 16.  But the Sixth

Amendment also provides a defendant with an implicit right to self-representation. *See Faretta v. California*, 422 U.S. 806, 832 (1975); *Arguello*, 772 P.2d at 92. Before proceeding pro se, however, a defendant must waive their right to counsel. *People v. Lavadie*, 2021 CO 42, ¶ 25. "A defendant's waiver of counsel is effective only if (1) the defendant is competent to waive the right and (2) the waiver is made voluntarily, knowingly, and intelligently." *Id.* at ¶ 26. Regarding the second prong, whether a waiver is knowing and intelligent is a separate inquiry from whether a waiver is voluntary. *People v. Davis*, 2015 CO 36M, ¶¶ 18-19.

> A waiver is knowing and intelligent if the record clearly shows that the defendant understood the nature of the charges, the statutory offenses included within them, the range of allowable punishments, the possible defenses to the charges and circumstances in their mitigation, and all other facts essential to a broad understanding of the whole matter.

*Lavadie*, ¶ 28 (citing *Arguello*, 772 P.2d at 94).

¶ 23　　The Colorado Supreme Court has suggested a series of fourteen questions — generally known as an *Arguello* advisement or inquiry — that the trial court should ask a defendant, who wants to proceed pro se, to determine the validity of their waiver. *Arguello*,

772 P.2d at 98. But "'[a] court's failure to comply substantially with this requirement does not automatically render the waiver invalid' if the totality of the circumstances supports the validity of the waiver." *Lavadie,* ¶ 36 (quoting *Arguello,* 772 P.2d at 96). So a trial court must consider the totality of the circumstances in determining whether a defendant validly waived his right to counsel. *Id.* at ¶¶ 39, 43. A trial court, however, "must indulge every reasonable presumption against finding a waiver of the right to counsel." *Id.* at ¶ 29.

¶ 24    Whether a defendant validly waived his right to counsel is a mixed question of law and fact, meaning we defer to the trial court's factual findings if supported by the record but review de novo the legal question of whether the facts establish a valid waiver. *Id.* at ¶ 22.

¶ 25    An invalid waiver of the right to counsel is a structural error, requiring automatic reversal. *People v. Bergerud,* 223 P.3d 686, 696 (Colo. 2010); *Hagos v. People,* 2012 CO 63, ¶ 10.

### 3.    Analysis

¶ 26    Martinez-Hernandez first contends that the trial court erred when it found that he knowingly and intelligently waived his right to

11

counsel at the sixth hearing on December 7, 2020.  Specifically, he contends that he didn't understand (1) the nature of the charges; (2) the possible punishments; and (3) the requirement to follow the rules of procedure.  He also asserts that he didn't have (4) a "broad understanding of the whole matter."  *Arguello*, 772 P.2d at 94.

¶ 27     As a threshold matter, we note that the trial court specifically asked Martinez-Hernandez twelve of *Arguello*'s fourteen questions.  *See id.* at 98.  For the ones involving his rights, Martinez-Hernandez indicated that he understood each of them, although the trial court had to repeat the questions for two of them.

¶ 28     As for the remaining two *Arguello* questions — (1) Do you understand that if you can't afford an attorney that one will be provided to you free of charge? and (2) Do you understand I will appoint counsel if you want an attorney to represent you? — the trial court told Martinez-Hernandez, "[Y]ou cannot afford an attorney to represent you right now.  I have appointed Mr. Shaffer to represent you at no cost to you."  This statement by the trial court informed Martinez-Hernandez that he had the right to an attorney if he couldn't afford one and that one would be provided to him free of charge, like all four of his attorneys for this case had

12

been, if he requested one. So the record establishes that the trial court substantially complied with the inquiry required under *Arguello.* *See Lavadie,* ¶ 36.

¶ 29    We now address each of Martinez-Hernandez's four contentions in turn. Viewing them in the context of the trial court's *Arguello* advisement and Martinez-Hernandez's responses, we conclude that the trial court didn't err in finding that Martinez-Hernandez knowingly and intelligently waived his right to counsel.

¶ 30    We address his first and second contentions — that he didn't understand the nature of the charges and the possible punishments — together. During the *Arguello* advisement, the trial court displayed the amended complaint to Martinez-Hernandez and read all five counts to him, including the date the offense occurred, the description of the offense from the amended complaint, the punishment range if he was convicted, and any possible fines. Then, although the court had to repeat the question, Martinez-Hernandez confirmed that he understood that he would face a mandatory prison sentence if a jury found him guilty at trial of count one or count two. Based on the trial court's detailed explanation of the then-pending charges and Martinez-Hernandez's

13

expressed understanding of the mandatory prison sentences for count one and count two, the record clearly supports the trial court's finding that Martinez-Hernandez understood the nature of the charges and possible punishments.

¶ 31 We next address his third contention that he didn't understand the requirement to follow the rules of procedure at trial. While on December 7 the trial court didn't specifically inquire into whether Martinez-Hernandez understood that he would have to comply with the rules of procedure during trial, Judge Gurly had previously informed him of this requirement during the November 4, 2020, ex parte hearing. (In denying his request to proceed pro se on November 4, Judge Gurley found that Martinez-Hernandez wasn't familiar with the procedural rules that would apply during his trial, not that he didn't understand that they would apply.)

¶ 32 Furthermore, the totality of the circumstances supports the validity of Martinez-Hernandez's waiver of counsel. *See Arguello*, 772 P.2d at 96. The trial court substantially complied with *Arguello*

by asking Martinez-Hernandez the suggested questions.[2]  Based on this record, we can't conclude that the trial court failing to explicitly ask Martinez-Hernandez whether he understood that rules of procedure would apply at trial during its December 7 colloquy rendered his waiver of counsel invalid.

¶ 33     Finally, we reject his fourth contention that the record shows that he didn't have a "broad understanding of the whole matter." To begin, the trial court asked questions sufficient to generally ascertain Martinez-Hernandez's ability to understand the whole matter.  The court asked whether he had any legal training; how far he went in school; and whether he was under the influence of any alcohol, drugs, or medications.  Furthermore, the court confirmed that Martinez-Hernandez understood a variety of rights that he had at trial, including the right to remain silent, right to cross-examine witnesses, and the right to call witnesses on his behalf.  Moreover, the exchange between the trial court and Martinez-Hernandez didn't consist "merely of pro forma answers to pro forma questions."

---

[2] We note that inquiring into a defendant's understanding that the rules of criminal procedure will apply at trial isn't one of the fourteen suggested *Arguello* questions.  *People v. Arguello*, 772 P.2d 87, 98 (Colo. 1989).

*Id.* at 95. Indeed, the trial court showed Martinez-Hernandez the amended complaint and the CBI laboratory report. Further, the trial court asked Martinez-Hernandez why he wanted to defend himself, thereby starting a back-and-forth dialogue between the two about Martinez-Hernandez's concerns with his current counsel. Given this dialogue and the fact that the trial court diligently asked Martinez-Hernandez the suggested questions from *Arguello*, the totality of the circumstances supports the trial court's conclusion that Martinez-Hernandez knowingly and intelligently waived his right to counsel. Accordingly, the trial court didn't err by accepting Martinez-Hernandez's waiver of counsel.

## B. Advisory Counsel

¶ 34 Martinez-Hernandez next contends that the trial court erred by not appointing advisory counsel over his objection. We discern no error.

### 1. Additional Facts

¶ 35 The trial court twice offered to appoint advisory counsel for Martinez-Hernandez. First, on December 7, 2020, before finding that Martinez-Hernandez had waived his right to counsel, the trial court explained that it had "the option of appointing what is called

advisory counsel. The difference is that you would still represent yourself, but there would be an attorney present in the courtroom to advise you if you had questions." Martinez-Hernandez responded that he didn't want the trial court to appoint advisory counsel.

¶ 36    Second, on the morning trial began, the trial court again asked Martinez-Hernandez if he wanted it to appoint advisory counsel to assist him during trial. Martinez-Hernandez again declined, but the trial court went on to explain the difference between counsel and advisory counsel. Martinez-Hernandez confirmed that he didn't want advisory counsel. After he declined advisory counsel for a third and final time, the trial court reaffirmed its decision to allow Martinez-Hernandez to represent himself at trial.

¶ 37    At trial, Martinez-Hernandez didn't conduct voir dire, cross-examine any of the People's witnesses, call any witnesses testify on his behalf, or testify on his own behalf. But he gave an opening statement and closing argument.

### 2.    Standard of Review and Legal Principles

¶ 38    A trial court may use its discretion to appoint advisory counsel. *People v. Romero*, 694 P.2d 1256, 1265 (Colo. 1985). We, therefore, review a trial court's decision to not appoint advisory

17

counsel for an abuse of discretion. *People v. Waller*, 2016 COA 115, ¶ 29.

¶ 39   "While a defendant has the constitutional right to represent himself, he has no right to the appointment of advisory counsel in connection with the exercise of his right of self-representation." *Romero*, 694 P.2d at 1265. But "there may be circumstances where a pro se defendant's performance reaches such a level of ineptitude as to demonstrate a fundamental inability to provide any meaningful representation in his defense." *Id.* Factors relevant to appointing advisory counsel include (1) the factual and legal complexity of the issues; (2) the defendant's familiarity with the criminal trial process; and (3) the defendant's formal education and ability to effectively communicate with the court and jury. *Id.*

### 3.   Analysis

¶ 40   Martinez-Hernandez argues that because he didn't meaningfully participate in trial and his self-representation was so inept, the court should have appointed advisory counsel over his objection. The People respond that Martinez-Hernandez's performance at trial wasn't due to an inability to represent himself but rather was a strategic decision not to participate. We conclude

18

that the trial court didn't abuse its discretion by not appointing advisory counsel to assist Martinez-Hernandez at trial over his objection.[3]

¶ 41     To begin, we reject Martinez-Hernandez's contention that his lack of participation in certain portions of the trial proceedings, by itself, establishes or is even strongly indicative that he didn't know how to participate in the proceedings if he had wanted to. Instead, such lack of participation is just as indicative of a strategic decision to stay silent at certain times. In any event, the trial court was in the best position to make such an assessment. Indeed, by the time of trial, Martinez-Hernandez had appeared in front of the trial court for almost three years. The court, therefore, had interacted with him on numerous occasions and had the "opportunity to evaluate any potential issues related to [Martinez-Hernandez's] formal

---

[3] The law is somewhat unclear as to whether a trial court can appoint advisory counsel over a defendant's objection. In *People v. Romero*, 694 P.2d 1256, 1265 (Colo. 1985), the supreme court noted that a trial court may appoint advisory counsel "over the objection of an accused." But the supreme court later explained that "[a]dvisory counsel may assist a pro se defendant only if and when the defendant requests such assistance." *Downey v. People*, 25 P.3d 1200, 1203 (Colo. 2001). We proceed, however, assuming that the trial court had discretion to appoint advisory counsel over Martinez-Hernandez's objection.

education or ability to communicate with the court and jury."
*Waller*, ¶ 40.

¶ 42    Moreover, the factual and legal issues at trial weren't particularly complex. *See Romero*, 694 P.2d at 1265. The charges arose from one traffic stop where troopers searched the vehicle and found what appeared to be drugs. Indeed, the People only called four witnesses at trial. We also note that at no time during the proceedings did any of Martinez-Hernandez's attorneys or himself allege or assert that he struggled with his mental health such that it would affect his ability to represent himself at trial. *See Waller*, ¶ 40 (concluding that the trial court didn't abuse its discretion in not appointing advisory counsel when, among other reasons, no one had alleged that the defendant "suffered from a limited education or mental health problems"). Finally, it's unclear from the record whether Martinez-Hernandez had previously represented himself at a criminal trial or had even participated in a criminal trial before. But even assuming that this factor weighs in favor of appointing advisory counsel, given the number of other factors that weigh against appointing advisory counsel, the trial court didn't abuse its discretion. *See Romero*, 694 P.2d at 1266 (concluding that the trial

court didn't abuse its discretion in failing to appoint advisory counsel "although the defendant might well have fared better if he had the benefit of advisory counsel").

¶ 43 And critically, Martinez-Hernandez repeatedly refused to have the trial court appoint advisory counsel.

¶ 44 For these reasons, we conclude that the trial court didn't abuse its discretion by not appointing advisory counsel over Martinez-Hernandez's objection.

## C. Biased Jurors

¶ 45 Martinez-Hernandez next contends that the trial court erred by empaneling three biased jurors in violation of his rights to trial by an impartial jury and to conviction only upon proof beyond a reasonable doubt. Because this contention was waived, we decline to consider its merits.

¶ 46 Martinez-Hernandez didn't move to strike — either for cause or by a peremptory challenge — any of the allegedly biased jurors. In fact, he didn't exercise any of his peremptory challenges. Still, he argues that the trial court should have excused these jurors sua sponte.

¶ 47    We conclude that by failing to exercise any peremptory strikes, Martinez-Hernandez waived any challenge to the trial court's failure to excuse allegedly biased jurors. Recently, a division of this court concluded that a defendant who failed to exercise all his peremptory challenges waived appellate review of a claim that the trial court erred by denying the defendant's for-cause challenge to an allegedly biased juror. *People v. Vergari*, 2022 COA 95, ¶ 13. The division reasoned that having unexercised opportunities to remove an allegedly bias juror is a "'classic example' of an intentional relinquishment of a known right." *Id.* (citation omitted); *see also Hammond v. Peden*, 278 S.W.2d 96, 98 (Ark. 1955) ("[I]f a litigant fails to exhaust his peremptory challenges he waives any error committe[d] by the court in failing to excuse a challenged juror."); *Jordan v. United States*, 295 F.2d 355, 356 (10th Cir. 1961) ("By his failure to exercise any challenge for cause and by his use of only half of his peremptory challenges, the defendant has waived the right to complain that he was not tried by an impartial jury."). If a defendant waives review of a preserved for-cause challenge by failing to exercise all of his peremptory challenges, then certainly Martinez-Hernandez waived an unpreserved for-cause challenge by

failing to exercise any peremptory challenges at all.  Accordingly, we decline to address this contention.

## D.     Prosecutorial Misconduct

¶ 48     Martinez-Hernandez next contends reversal is required because of prosecutorial misconduct.  We aren't persuaded.

### 1.     Legal Principles and Standard of Review

¶ 49     When reviewing claims of prosecutorial misconduct, we engage in a two-step analysis.  *Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010).  First, we determine whether the prosecutor's challenged conduct was improper based on the totality of the circumstances and, second, whether such conduct warrants reversal applying the appropriate standard of reversal.  *Id.*

¶ 50     If the defendant contemporaneously objected at trial and the error isn't of constitutional magnitude, we review for harmless error.  *Id.* at 1097.  But if the defendant fails to contemporaneously object to the prosecutor's alleged misconduct — whether the misconduct implicates a constitutional right or not — then we review for plain error.  *Id.*; *see Hagos*, ¶ 14.  Prosecutorial misconduct constitutes plain error if it's "'flagrant or glaringly or tremendously improper' and so undermine[s] the fundamental

23

fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction." *People v. Carian*, 2017 COA 106, ¶ 52 (quoting *People v. Cevallos-Acosta*, 140 P.3d 116, 122 (Colo. App. 2005)).

## 2.    Analysis

¶ 51    Martinez-Hernandez contends that the prosecutor engaged in two instances of misconduct.  We address both below.

### a.    Statements During Voir Dire

¶ 52    First, Martinez-Hernandez contends that the prosecutor misrepresented the law, undermined the presumption of innocence, and lowered the burden of proof when he told the jury panel during voir dire, "Well smoke is good circumstantial evidence of fire, right?" The parties agree that this issue isn't preserved and should, therefore, be reviewed for plain error.

¶ 53    During voir dire, the prosecutor explained to the jury panel the difference between circumstantial evidence and direct evidence.  He then asked the panel, "[I]n the instance that you were persuaded by the facts that were presented, could everyone judge the situation of guilty?"  One of the jurors responded, "I still have this thought that where there's smoke, there's fire, so . . . I don't know if I would be

24

able to." In response, the prosecutor said, "Okay. Well smoke is good circumstantial evidence of fire, right?" The prosecutor then explained, "But it's not . . . everything, right? Can you . . . hear from witnesses, could you heard [sic] from a firefighter, could you do those different things and then make a determination based on that?"

¶ 54 Viewing the prosecutor's statements in the context of his discussion about circumstantial evidence and direct evidence, we aren't persuaded that the prosecutor engaged in misconduct by misstating the law. The juror initially said, "[W]here there is smoke there is fire," and the prosecutor connected that statement to the ongoing conversation about circumstantial evidence, while clarifying immediately after that the smoke was "not . . . everything" needed to prove there was a fire. In doing so, we aren't persuaded that the prosecutor misstated the law, undermined the presumption of innocence, or lowered the burden of proof. Accordingly, we discern no misconduct. And to the extent that the prosecutor's comment could have been construed as a misstatement of the law, we note that the trial court properly instructed the jurors on the burden of proof, told them they may not be influenced by bias or

prejudice, and informed them they must follow the law as it instructed them.  Thus, we discern no basis for reversal.

¶ 55    In a footnote, Martinez-Hernandez also contends that the prosecutor undermined the burden of proof in the following conversation with Juror T:

> [PROSECUTOR]: [I]n the instance that you were persuaded by the facts that were presented, could everyone judge the situation of guilty?  What do you think, [Juror T]?
>
> [JUROR T]: (Unintelligible) and I have to see the evidence.
>
> [PROSECUTOR]: Okay.
>
> [JUROR T]: And their character and see what happened.
>
> [PROSECUTOR]: *All right, that's correct.*

(Emphasis added.)

¶ 56    As noted above, the jurors were properly instructed on the law, including that they may not be influenced by bias or prejudice. Also, looking at the context of Juror T's reference to character, it's unclear what type of character trait or who she was referring to. But ultimately, Martinez-Hernandez doesn't explain how the prosecutor's statement undermined the prosecution's burden of proof, and so we decline to consider this undeveloped contention

further.  *See People v. Cuellar*, 2023 COA 20, ¶ 44 (declining to address undeveloped argument).

### b.    Alleged Late Disclosure

¶ 57    Second, Martinez-Hernandez contends that the prosecutor committed reversible misconduct by failing to timely disclose discovery to Martinez-Hernandez before his trial.  Specifically, he contends that the prosecutor had an obligation to ensure that Martinez-Hernandez had access to the discovery after he changed attorneys and eventually when he represented himself.  He contends that the prosecutor should have known that there were issues with his prior attorney giving him access to the discovery; therefore, when he became pro se, the prosecutor should have known that Martinez-Hernandez didn't have the discovery and should have ensured that it was provided to him.  The parties agree that this issue isn't preserved and is, therefore, reviewed for plain error.

¶ 58    On the morning trial began, Martinez-Hernandez explained to the court that he had just received the discovery from the People only four days prior.  The prosecutor confirmed this but said that he had assumed that Martinez-Hernandez's prior attorneys had

27

given him the discovery. Multiple times that morning, the trial court offered to continue the trial so that Martinez-Hernandez had more time to review the discovery, but Martinez-Hernandez refused each time.[4]

¶ 59 Martinez-Hernandez doesn't cite anything to support his contention that the prosecutor had a continuing obligation to make sure he had access to the discovery after he became pro se. And the prosecutor confirmed that the district attorney's office had given the discovery to each of Martinez-Hernandez's prior counsel. Therefore, we discern no misconduct by the prosecutor in failing to timely ensure that a pro se defendant had the discovery before trial when they had disclosed the discovery to the defendant's prior counsel.

## E. The Video

¶ 60 Martinez-Hernandez next asserts that the jury had insufficient evidence to convict him because it relied on a fabricated video. He

---

[4] Martinez-Hernandez doesn't contend on appeal that the trial court plainly erred by not continuing the trial. Nor do the People contend that his insistence to proceed waived this claim of alleged prosecutorial misconduct. Thus, we don't address either of these issues.

also asserts that the prosecutor committed misconduct by showing the allegedly fabricated video to the jury. The trial court admitted a redacted video exhibit at trial that purported to show the traffic stop. Trooper Bollen testified at trial that the video accurately reflected the traffic stop. Martinez-Hernandez doesn't offer any support for his contention that the video is fabricated other than the fact that he doesn't appear in the video and that the license plate shown in the video is unreadable. But these two assertions do not establish that the video was fabricated, and so this claim fails. *See McCoy v. People*, 2019 CO 44, ¶ 63.

## F.   Cumulative Error

¶ 61   Because we haven't identified any errors — much less multiple errors — there can be no cumulative error. *See People v. Jones*, 2025 COA 43, ¶ 56 (*cert. granted* May 1, 2025); *People v. Grant*, 2021 COA 53, ¶ 76.

## III.   Disposition

¶ 62   The judgment is affirmed.

JUDGE GROVE and JUDGE JOHNSON concur.